**James B. CLARK, Jr., Defendant below, Appellant,**

v.

**STATE of Delaware, Plaintiff below, Appellee.**

Supreme Court of Delaware.

Submitted May 23, 1975.

Decided Aug. 29, 1975.

**232**

Peter M. Sieglaff, Potter, Anderson & Corroon, Wilmington, for defendant below, appellant.

Charles P. Brandt, Chief Deputy Atty. Gen., Wilmington, for plaintiff below, appellee.

Before HERRMANN, C. J., DUFFY, J., and QUILLEN, Chancellor.

HERRMANN, Chief Justice:

In this appeal from conviction of kidnapping (11 Del.C. § 623) and assault with intent to murder (11 Del.C. § 577),[1] the determinative question is whether, under the totality of the circumstances, the procedure adopted for the out-of-court identification of the defendant by the victim, evidence of which was admitted at trial, was so unnecessarily suggestive and so unreliable as to deny to the defendant due process of law guaranteed to him under the Fourteenth Amendment to the Federal Constitution.

I.

When the offense occurred, the defendant was 16 years old[2] and the victim was a girl 3 years, 8 months old.

At about 3:00 p. m. on March 5, the victim was carried or led away from the yard in the rear of her mobile home located in a trailer park about 2 miles from the Junior High School here involved. At about 3:30 p. m. on the same day, Alan Heller, a neighbor of the victim and a schoolmate of the defendant, was walking home from school along the railroad tracks adjacent to the trailer park. Heller heard "something crying" and discovered the victim alone and crying near a shack, containing a bed, about a quarter of a mile into the woods adjoining the railroad tracks. Heller testified that the victim was wearing a jacket

---

1. Code citations are to the 1953 Code.

2. The defendant was tried without a jury in the Superior Court under 10 Del.C. § 938

(a)(1) and (2), upon the Family Court's finding that he was not amenable to Family Court processes.

and leotards; that she appeared to be "beat up"; that she had bruises on the neck and was bleeding at the mouth; that he put on her blue jeans which he found at the scene; that when he asked her what happened, she said "some bad boy took her down there".

At about 4:30 p. m. on the day of the crime, a security guard saw the defendant running along the railroad tracks about one-half of a mile from the wooded area where Heller found the victim. The defendant as well as other students had been absent from their last class that day, which commenced at 2:20 p. m. The defendant was seen running along the tracks in a direction away from the place where the victim had been found by Heller; but this was also the direction and the route the defendant usually took from school to his home. He "kept looking back" as he ran. The security guard testified that a "lot of boys" the defendant's age frequently played near and walked home from school along those tracks. In fact, Heller saw some boys along the tracks when he returned to the place where he found the victim shortly after taking her home. The security guard also recalled that he had seen the defendant walking home along the tracks a few days prior to the crime, at the same hour and place he saw the defendant on the day of the crime.

The chief investigating officer was Detective Tasker of the Delaware State Police. He interviewed the victim and her mother at about 4:30 p. m. He noted that the victim was in "quite a bit of pain due to scratches and marks on her face". He "learned from her that, the way she said it, the bad man had taken her from her back yard, while she was at play to some location in the wooded area, and beat her in the face and strangled her. I think she used the word 'choked'." Using himself as an example, Tasker learned from the victim that the "bad man" who had been with

her in the woods was a white male, younger than Tasker, about the same height but with darker hair, and with "something on his teeth".

The victim was examined at the hospital at about 6:30 p. m. She was found to have bruises and "pinpointed ruptured blood vessels that had accumulated under the skin of her face" caused by "pressure on the neck". The physician testified that such hemorrhages indicated "possible attempt to strangulation", when considered in conjunction with a mark "the size of a thumb" on her neck. The physician stated that the child had undoubtedly been rendered unconscious by choking; that her genital organs externally looked normal, except for a bruise on the inner side of the labia major.

On March 6, the day after the offense, Tasker informed vice principal McClain of the results of his investigation. McClain suggested the defendant and one other boy as suspects, but the investigation focused on the defendant because he wore braces on his teeth, was not in school during the last class on March 5, and, in McClain's opinion "was capable of a violent act".[3]

Tasker then contacted the defendant's father and advised him that the defendant was suspected of the crime. The father agreed that the victim should be given the opportunity to identify or exonerate the defendant.

For the confrontation, held at about noon on March 6, the victim and her mother were brought to the School and were seated in the principal's office, along with the defendant's father and Mr. Conrad, the principal. They waited there together for 10 or 15 minutes. The principal's office was a small room, about 10 feet wide and 12 feet long. Just prior to bringing the defendant into the principal's office, Tasker informed the assembled group, which included the victim, that he was going to

---

3. The foregoing statement of facts outlines the sum and substance of the State's case against the defendant, except for the out-of-court identification here under scrutiny.

bring the defendant into the room and would ask the victim if the defendant was the "bad man". During prior interviews with the victim, she and Tasker had referred to her abductor as the "bad man"; and it had been explained to the victim that Tasker was a police officer who would help to find the "bad man". The defendant was summoned out of class by vice principal McClain who told the defendant, without explanation, that he was to go to the principal's office. Tasker and Detective Lake met the defendant outside the principal's office and Tasker told him that he was "investigating the kidnapping and assault of a young girl" and "wanted him to come * * * to be looked at by the girl."

The defendant was escorted into the principal's office with Detective Tasker in front of him and Detective Lake behind him. They stopped from 2 to 5 feet in front of the victim, so that the defendant was standing directly in front of the victim, with a police officer on either side of him, and vice principal McClain directly behind him. There was no one else present in the office who resembled the defendant in age or appearance. McClain testified that, at this point, the defendant "was obviously the focus" of the confrontation. Tasker testified that he then asked the victim if the defendant was the "bad man that hurt you"; that she replied "yes" and nodded her head; that he then asked her "Are you sure this is the bad man?" The victim, by then seated on her mother's lap, said "yes". The answers were given by the victim without hesitation. The confrontation lasted only a few seconds.

The victim's mother testified that her daughter reacted with fear when she saw the defendant. However, the principal testified that the victim showed no fear or sign of recognition when the defendant was brought into the room, other than to take a step backwards toward her mother as she was approached by the defendant and the two police officers, a reaction which the principal agreed was normal for a child of 3 years whose "territory" was being threatened. The vice principal also testified that the victim exhibited no fear or recognition of the defendant, but simply said "yes" when asked if he was the "bad man", and then put her lollipop back in her mouth and returned to her mother's lap.

Detective Tasker agreed that there was no exigency that necessitated a show-up before arrangements for a line-up could be made.

At the trial, the State offered evidence of the out-of-court identification. The defendant objected and moved to suppress all evidence of the out-of-court identification on the ground that the show-up was so suggestive as to be unreliable and, therefore, testimony concerning the results of the show-up would violate the defendant's right to due process of law. The Trial Judge denied the motion and permitted Detective Tasker and the school officials who were present to testify concerning the out-of-court identification.

During the voir dire examination of the victim (then 4 years, 4 months old) to determine her competency to testify at the trial, she testified as follows:

"Q. Kathleen, do you remember the bad man?

"A. Yes. If you bring him in, I'll pick him.

"Q. Do you think you can?

"A. (Witness nods head yes.)

  *     *     *     *     *     *

"Q. Kathleen, you know you will be able to pick out the man that hit you; is that right?

"A. (Witness nods head yes.)

"Q. Is that because you know what he looks like?

"A. (Witness nods head yes.)

"Q. Would you tell me what he looks like?

"A. I don't know what he looks like.

"Q. You don't know what he looks like?

"A. But I can see what he looks like.

\* \* \* \* \* \*

"Q. What did you say, Kathleen, after you said I don't know what he looks like?

"A. I know—I will pick him out.

\* \* \* \* \* \*

"Q. Kathleen, couldn't you tell me what the bad man looked like?

"A. Uh-uh.

"Q. Could you tell me?

"A. If you bringed him in here."

The Trial Judge ruled that the victim was competent to testify. At the conclusion of its case, the State called the victim to make an in-court identification of the defendant. Over the objection of the State, the Trial Judge permitted an in-court line-up consisting of seven high school students and the defendant. When the line-up was ready, the victim was brought into Court by one of the prosecutors and placed so that she faced the line-up at a distance of about 10 feet and had a clear view of each boy, including the defendant. She seemed to study each face; and then her testimony, adduced by the State, was as follows:

"MR. BRANDT: Kathleen, I am going to turn you around and I want you to look at every face of the boys who are standing, and I want you to point to the bad boy. Look at every face, honey.

"KATHLEEN: Not there.

"MR. BRANDT: Do you see him?

"KATHLEEN: No."

A photograph of the line-up was taken and counsel stipulated to its inclusion in the trial record. The in-court line-up took place about 9 months after the crime was committed. The defendant's hair was considerably longer at the trial than it had been 9 months earlier; but the victim had been told by her mother during the trial that the "bad boy" now had long hair. The defendant had also grown a slight mustache and was not wearing teeth braces at the trial; but all boys in the line-up were instructed to keep their mouths closed during the line-up proceeding.

After the line-up testimony, the defendant renewed the motion to suppress all evidence of the out-of-court identification. The motion was denied. The trial ended without an in-court identification.

The defendant was found guilty by the Trial Judge and was sentenced to mandatory life imprisonment on the kidnapping charge and a concurrent sentence on the charge of assault with intent to murder. The defendant appeals on the ground that the out-of-court identification was so suggestive and unreliable as to violate his right to due process of law.

II.

The question before us is whether the Trial Judge erred in admitting evidence of the out-of-court confrontation and identification. We think he did and that, as a result, the defendant was denied due process of law.

The scope of due process protection against the admission of evidence of, or derived from, suggestive out-of-court identification procedures has been defined in a series of comparatively recent decisions of the United States Supreme Court.

In *Stovall v. Denno,* 388 U.S. 293, 87 S. Ct. 1967, 18 L.Ed.2d 1199 (1967), the Supreme Court held that whether the confrontation conducted in a particular case is "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of

law \* \* \* depends on the totality of the circumstances surrounding it \* \* \*." 388 U.S. at 302, 87 S.Ct. at 1972, 18 L. Ed.2d at 1206.

In *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Court phrased the test as whether the identification procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384, 88 S.Ct. at 971, 19 L.Ed.2d at 1253. The *Stovall* phraseology was repeated in *Foster v. California,* 394 U.S. 440, 442, 89 S.Ct. 1127–28, 22 L.Ed.2d 402–06 (1969); and in *Neil v. Biggers,* 409 U.S. 188, 196, 93 S.Ct. 375, 380, 34 L.Ed.2d 401, 409 (1972), the Court referred to the *Simmons* formulation as a restatement of the *Stovall* governing test. See *Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); *Brown v. State,* Del.Supr., 329 A.2d 153 (1974).

The Court's most recent summation of the applicable objectives and guidelines, evolving from that series of cases, appears in *Biggers*:

"Some general guidelines emerge from these cases as to the relationship between suggestiveness and misidentification. It is, first of all, apparent that the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.' *Simmons v. United States,* 390 U.S., at 384, 88 S.Ct., at 971. While the phrase was coined as a standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification, with the deletion of 'irreparable' it serves equally well as a standard for the admissibility of testimony concerning the

out-of-court identification itself. It is the likelihood of misidentification which violates a defendant's right to due process, and it is this which was the basis of the exclusion of evidence in *Foster.* Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous. But as *Stovall* makes clear, the admission of evidence of a showup without more does not violate due process." (93 S.Ct. at 381–82)

The "central question", the Court tells us in *Biggers,* is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." 93 S.Ct. at 382.[4] And the Court concludes that "[a]s indicated by our cases", the factors to be considered in evaluating the likelihood of misidentification:

"\* \* \* include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation \* \* \*." (93 S.Ct. at 382)

▉ In applying the controlling tests and resolving the issues presented, we review the record of this case with two guidelines in mind: (1) we address the merits and the facts insofar as "constitutional significance" is to be attached to them, *Neil v. Biggers,* 93 S.Ct. at 379, n. 3; and (2) the constitutional error that the

---

4. It is noted that, in *Biggers,* the Court intimates that due process may require that a post-*Stovall* out-of-court identification procedure be excluded from evidence by reason of unnecessary suggestiveness alone; but the Court found that problem had "no place" in the pre-*Stovall* case there under consideration. 93 S.Ct. at 382. In *United States ex rel. Kir-*

*by v. Sturges,* 7 Cir., 510 F.2d 397 (1975), the Seventh Circuit Court of Appeals concluded that the strict exclusionary rule "hinted" in *Biggers* is not mandated by the Due Process Clause. 510 F.2d at 406. We note the problem; but it likewise has no place in this post-*Stovall* case in view of the result we reach.

rule of *Stovall* is intended to avoid is an unfair trial, not merely an unfair identification, *United States ex rel. Kirby v. Sturges*, 7 Cir., 510 F.2d 397, 408 (1975).

■ There are two determinative questions before us under the prescribed tests and guidelines: (1) Was the confrontation "unnecessarily suggestive"? and (2) was there a "likelihood of misidentification"?

■ The victim had the susceptibilities of the average child of less than 4 years. At the time of the show-up, she knew that Detective Tasker was a police officer who "arrests people" and who was "investigating the crime that had just happened to her". She had been told by her mother on the day before the show-up that a policeman was "someone who helps to solve cases and to find people who break the law and do bad things". Tasker, in uniform, had talked to the child in her home for about an hour "like a friend". Tasker testified: "I believe in her mind it was a foregone conclusion that I was a policeman trying to catch the bad man". Her term "bad man" was quickly adopted by them both to identify the assailant.

It was against this background of confidence by the child victim in a friendly police officer that, after the child waited for something to happen for 10 or 15 minutes, with her mother, the principal, and the defendant's father, the defendant was "escorted" into the small office of the principal to confront the victim. The defendant was clearly in custody as he entered, with Detective Tasker in front of him, Detective Lake in back of him, and vice principal McClain bringing up the rear; and as the defendant was placed in front of the child and her mother, Tasker stood closely on his right, Lake stood closely on his left; and McClain stood closely behind. The police officer's only 2 questions were leading and in the precise terminology previously used by him and the child: "Is this the bad man that hurt you?" and "Are you sure this is the bad man?"

Upon the basis of the foregoing undisputed facts, we are of the opinion that the show-up here was unnecessarily suggestive.

■ Show-ups generally are inherently suspect and widely condemned. In this case, especially by reason of the victim's tender age and consequent impressionability, the show-up was impermissibly suggestive. We are satisfied that the police were attempting to fairly and quickly identify the offender; that, therefore, their purpose was commendable. But the victim, whose decision was crucial here, was little more than an infant; and for that reason, more stringent procedures should have been adopted in order to avoid her natural susceptibility to suggestion.

■ As indicated in *Stovall,* justification for a show-up is a factor to be considered in the "totality of the circumstances". The State has offered insufficient justification, in our opinion, for the use of a show-up instead of a line-up as the identification procedure in this case. It appears that the preferable line-up procedure could have been arranged quickly, quietly, and without detriment to the child or the defendant. It follows, in our view, that an unnecessarily suggestive identification procedure was employed in this case.

Unnecessary suggestiveness having thus been found, there remains for consideration the reliability factor in its relation to the "substantial likelihood of irreparable misidentification".

In the final analysis, the out-of-court identification here consisted solely of a response made in a matter of seconds by a child of the age of 3 years and 8 months under significantly suggestive circumstances. Under the totality of the circumstances, we conclude that the child's out-of-court identification was insufficiently reliable to meet the tests and guidelines laid down by the United States Supreme Court to assure fair trial. We find, therefore, "substantial likelihood of misidentification" and resultant denial of the defend-

ant's due process of law rights guaranteed to him under the Fourteenth Amendment.

Accordingly, we hold that the Superior Court erred in denying the motion to suppress and in admitting evidence of the out-of-court identification.

The conviction here is unsupported by any in-court identification. The conviction stands on an out-of-court identification which we have found unreliable under the law. It follows that the judgment below must be reversed and the case remanded for further proceedings consistent herewith.

APPENDIX

attached by
*Chief Justice Herrmann*

Trial testimony of the victim selected to demonstrate the child's natural susceptibility to suggestion and unreliability at the age of 4 years and 4 months, 9 months after the out-of-court identification:

"Q Have you ever been on that railroad track where the train goes?

"A Yes, a boy took me.

"Q A boy took you on the track?

"A Yes.

"Q What happened when the boy took you on the track?

"A I don't know.

"Why do they have that, the typewriter (indicating the Stenograph being operated by the court reporter)?

\* \* \* \* \* \*

"Q [by the Court] Was he a little boy like you or a big boy?

"A Big boy, a big boy. I am not a boy.

"Q Was he a big boy or was he a little boy like you are a little girl?

"A How you got teeth like that? You got bridgework right there (indicating).

"MR. WIER: Let the record reflect the Court has bridgework.

\* \* \* \* \* \*

"BY THE COURT:

"Q Kathleen, can you tell me what happened to you when you went across the railroad tracks?

"A (The witness shook her head.)

"Q Do you remember?

"A (The witness shook her head.)

"Q You don't remember? Do you remember what you were wearing that day?

"A (The witness shook her head.)

"BY MR. WIER [Deputy Attorney General]:

"Q Who took you across the railroad tracks?

"A A boy.

"Q What boy?

"A Bad boy.

"Q What did he do?

"A I don't know.

"[Mother]: Tell him.

"THE WITNESS: I don't know.

"[Mother]: You don't know what he did to you?

"THE WITNESS: (There was no response.)

\* \* \* \* \* \*

"Q Was there a tree on the ground that you can remember?

"A (The witness shook her head.) There wasn't any.

"MR. WIER: We are not playing games now.

\*   \*   \*   \*   \*   \*

"BY THE COURT:

"Q Did he have long hair or short hair?

"A I think he had long hair or short hair.

"MOTHER: How long is long? Where was it down to, above his ears, or below his ears, up here or down to his ears or here (indicating); where would you say it would be, his shoulders, maybe?

"THE WITNESS: (She nodded her head.)

\*   \*   \*   \*   \*   \*

"Q Do you know what color his [the bad boy's] hair is?

"A No.

"MR. WIER: Listen to the question, Kathleen. We are not playing now. I want you to answer the questions for Mr. Sieglaff.

\*   \*   \*   \*   \*   \*

"Q Do you know how long the boy's hair is who hit you?

"A My mommy said it's long.

"Q Your mommy said he had long hair?

"A He did.

"Q Is that what your mommy said to you?

"MR. BRANDT [Deputy Attorney General]: She just said he did.

"BY MR. SIEGLAFF [defense counsel]:

"Q Did your mommy tell you that the bad boy had long hair?

"A (Witness nods head yes.) It wasn't Alan.

"Q It wasn't Allen; is that what you said?

"A Because he got long hair.

"Q How long did your mommy tell you the bad boy's hair was? Can you show me?

"A I don't know.

"MR. WIER: Kathleen, if you are going to play with your mother, your mother will have to leave.

"THE WITNESS: I don't know.

\*   \*   \*   \*   \*   \*

"Q Do you remember when we came up here a few days ago to this room and talked to you, Kathleen?

"A I wasn't here.

"Q Would you like a piece of candy? May I give her a piece of candy, \* \* \*? Would you like one of these lifesavers?

"A (Witness nods head yes.)

"Q Then would you talk to me?

"MR. WIER: Kathleen, I want you to listen to the man's questions and answer them like you did for Mr. [Judge] McNeilly, and do that for Uncle Charlie [Brandt] and Uncle Dick [Wier].

\*   \*   \*   \*   \*   \*

"Q Did Tasker talk to you about the bad boy?

"A I don't know.

"Q You don't know. Did—

"A I want some more candy.

"Q Did Tasker talk to you about the bad boy?

"A I don't know. I don't know.

\*   \*   \*   \*   \*   \*

"Q Kathleen, I want to ask you a few questions about the bad man. Was he short or tall?

"A Tall, way up to the ceiling."