**Nathan E. COOK, Daniel M. Curran, and Larry James Phelps, Defendants below, Appellants,**

v.

**STATE of Delaware, Plaintiff below, Appellee.**

Supreme Court of Delaware.

Submitted Jan. 10, 1977.

Decided April 28, 1977.

Petition for Reargument Denied May 31, 1977.

Charles M. Oberly, III, State Prosecutor and Stephen M. Walther and Charles K. Meuse, Deputy Attys. Gen., Wilmington, for plaintiff-appellee.

J. Dallas Winslow, Jr., Asst. Public Defender, Wilmington, for defendant-appellant Cook.

Daniel F. Wolcott, Jr., of Potter Anderson & Corroon, Wilmington, for defendant-appellant Curran.

Joseph A. Hurley, Wilmington, for defendant-appellant Phelps.

Before HERRMANN, C. J., DUFFY and McNEILLY, JJ.

HERRMANN, Chief Justice:

Defendants were convicted of robbery in the first degree [11 *Del.C.* § 832], misdemeanor theft [11 *Del.C.* § 841], and conspiracy in the second degree [11 *Del.C.* § 512]. This appeal raises the question of the admissibility of dog-tracking evidence and the propriety of commenting upon a defendant's right to remain silent by counsel for a co-defendant. Additionally, defendants charge error in their detention, search, and pre-trial identification.

I.

The convictions in this case stem from the daylight robbery of a supermarket by three armed men. About six persons were inside the market at the time of the holdup and had the opportunity to observe the robbers; two store employees followed them as they made their escape in a waiting car. The pursuit continued until the employees observed the holdup-men exit from their automobile and head toward a nearby wooded area. The police were alerted, and within a few minutes they were deployed around the wooded vicinity.

A trained police dog was brought to the scene and, after being allowed to enter the abandoned vehicle for scents, began its tracking along a path in the woods. Meanwhile, a police officer, dispatched to an area about one mile from the abandoned car, observed the three defendants walking along the road adjacent to the woods. At this time, the officer knew that a robbery had been committed and that the robbers were on foot in the vicinity. Moreover, the radio description of the robbers fit two of the defendants. The officer approached the defendants and asked their names; and although that information was given, none had identification to substantiate his answer. When asked by the officer what they were doing in the area, the defendants responded that they had been "jogging in the woods." All three, however, were observed to be wearing either boots or loafers; none wore sneakers or other footwear appropriate for running. Furthermore, according to the officer's testimony, the men appeared exhausted and nervous. It was at this point that the officer informed the defendants that they were under a two-hour detention [11 *Del.C.* § 1902][1] on suspicion of armed robbery.

Acting under the assumption that the defendants were armed, the officer patted-down the defendant Curran and, upon finding a "hard cylindrical object" in the defendant's shirt pocket, the officer extracted the contents of the pocket which included a shotgun shell and $105 in currency. A second officer, meanwhile, was instructed to transport defendant Cook back to the

---

1. 11 *Del.C.* § 1902 provides:

"§ 1902. Questioning and detaining suspects.

"(a) A peace officer may stop any person abroad, or in a public place, who he has reasonable ground to suspect is committing, has committed, or is about to commit a crime, and may demand of him his name, address, business abroad, and where he is going.

"(b) Any person so questioned who fails to identify himself or explain his actions to the satisfaction of the officer may be detained and further questioned and investigated.

"(c) The total period of detention provided for by this section shall not exceed 2 hours. The detention is not an arrest and shall not be recorded as an arrest in any official record. At the end of the detention the person so detained shall be released or be arrested and charged with a crime."

supermarket for possible identification. During the course of the transportation, the officer noticed the defendant "squirming a bit" and also observed a large bulge in Cook's front pocket. Believing that it was some object which could be used against him, the officer removed the article which turned out to be 19 folded five dollar bills.

Back at the supermarket, for identification purposes, the three defendants were shown to the persons present during the robbery. Initially, the defendants were shown individually but later witnesses viewed all three men together. They were not shown to more than one witness at a time however and, after each presentation, the witness was instructed not to communicate with other witnesses. Two of the witnesses were able to identify defendant Phelps and one was able to identify defendant Curran by voice recognition only. None was able to identify defendant Cook. The defendants were then taken to the police station where the personal property of the three men was inventoried as a matter of routine; as a consequence, 10 five-dollar bills were found on defendant Phelps.

## II.

The defendants first challenge the legality of their initial "stop and detention" under 11 *Del.C.* § 1902. They contend that, both prior and subsequent to encountering the police officer, there was not a sufficient factual basis to justify a stop and detention. This contention is without merit: (1) the officer knew that there had been an armed robbery and that the suspects had escaped by automobile; (2) the automobile had been found approximately one mile from the place of detention and within minutes of the time of the robbery; (3) the defendants had no identification; (4) they told the officer a story inconsistent with observable fact; and (5) two of the defendants fit descriptions of the men being sought. Under these facts, even if the Statute's prerequisite "reasonable grounds to suspect" is likened to "probable cause," *De Salvatore v. State*, Del.Supr., 2 Storey 550, 163 A.2d 244 (1960); *United States ex rel. Mealey v.*

*State*, 352 F.Supp. 349 (D.Del.1972), there are facts here sufficient to satisfy that burden.

## III.

The second asserted ground for reversal relates to the money found during the weapons-frisk of defendants Curran and Cook. They allege that its discovery was the product of an illegal search and, therefore, inadmissible. Actually, there are two aspects of this contention: (1) that there was no reasonable basis to conduct a weapons frisk, but (2) that, in any event, the permissible scope of such a frisk was exceeded. See *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *Brown v. State*, Del. Supr., 295 A.2d 575 (1972); *Lewis v. State*, Del.Supr., 305 A.2d 617 (1973).

In attacking the reasonableness of the frisks for possible weapons, the defendants categorize the bases of the officers' actions as "mere hunches" which fall short of "specific and articulable facts" forming the basis of an officer's reasonable suspicion, as required by *Terry v. Ohio, supra,* and *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Characterizing the police officers' motivation as "mere hunches" ignores the specific facts of this case. Of determinative importance is the fact that the police knew that an armed robbery had occurred within minutes nearby. We have no doubt that the weapons-frisk was reasonable under the facts of this case.

Assuming, however, that seizure of the currency exceeded the scope of a reasonable search for weapons, we find that the evidence is admissible under the "inevitable discovery" exception to the exclusionary rules.

This exception, which has found increasing judicial favor, provides that evidence, obtained in the course of illegal police conduct, will not be suppressed if the prosecution can prove that the incriminating evidence "would have been discovered

through legitimate means in the absence of official misconduct." Comment, The Inevitable Discovery Exception to the Constitutional Exclusionary Rules, 74 *Col.L.Rev.* 88, 90 (1974). See, e. g., *United States v. Seohnlein*, (4th Cir.) 423 F.2d 1051, cert. denied, 399 U.S. 913, 90 S.Ct. 2215, 26 L.Ed.2d 570 (1970); *Gissendanner v. Wainwright*, (5th Cir.) 482 F.2d 1293 (1973); *People v. Fitzpatrick*, N.Y.Ct.App., 32 N.Y.2d 499, 346 N.Y.S.2d 793, 300 N.E.2d 139 (1973). We approve the "inevitable discovery" exception.

The instant case is a clear example of the type of situation intended to fall within the purview of the exception. As the commentator has noted:

"The majority of the cases employing the inevitable discovery exception involve instances in which the illegal police conduct occurred while an investigation was already in progress and resulted in the discovery of evidence that would have eventually been obtained through routine police investigatory procedure. The illegalities in such cases, therefore, had the effect of simply accelerating the discovery. In general, where the prosecution can show that the standard prevailing investigatory procedure of the law enforcement agency involved would have led to the discovery of the questioned evidence, the exception will be applied to prevent its suppression."

*Id.* at 91. The record indicates that, subsequent to an arrest, an inventory search at the police station, such as the one defendant Phelps underwent, was a routine procedure. In the course of that search, the money found on Curran and Cook would have been discovered; its discovery, therefore, was "inevitable."

Accordingly, under the facts of this case, the admission of the money in evidence was without error.

### IV.

The defendants assert the unconstitutionality of their pre-trial "show-up" to the witnesses of the robbery. Their assertion rests upon three separate contentions: (1) that the use of a show-up rather than a lineup was itself unnecessarily suggestive; (2) that the identifications were unreliable; and (3) that it was reversible error to show the defendants as a group to the individual witnesses.

Recently, this Court has decided several cases involving pre-trial identification proceedings and, in particular, show-ups. See, e. g., *Smith v. State*, Del.Supr., 352 A.2d 765 (1976); *Harris v. State*, Del.Supr., 350 A.2d 768 (1975); *Watson v. State*, Del. Supr., 349 A.2d 738 (1975); *Clark v. State*, 344 A.2d 231 (1975); *Smith v. State*, Del. Supr., 343 A.2d 606 (1975). As these cases indicate, two questions are determinative in evaluating a claimed due process violation: (1) was the confrontation in fact unnecessarily suggestive; and (2) was there a likelihood of misidentification. Both the suggestiveness and likelihood of mistaken identification are to be judged by the "totality of the circumstances" involved. *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Asber v. State*, Del. Supr., 253 A.2d 204 (1969).

The defendants rely primarily upon *Clark v. State, supra.* Factually, however, that case is inapposite. Not only was the show-up in *Clark* conducted on the day after the committed offense but, more importantly, the identification in that case was by a child less than four years of age. The importance of this latter factor was emphasized in *Clark*:

"Show-ups generally are inherently suspect and widely condemned. In this case, especially by reason of the victim's tender age and consequent impressionability, the show-up was impermissively suggestive. . . . [Because the victim was an infant] more stringent procedures should have been adopted in order to avoid her natural susceptibility to suggestion."

*Id.* at 237.

While a show-up may be inherently suspect, this Court has held that prompt on-the-scene confrontations, *per se*, are not so unnecessarily suggestive as to constitute

violations of due process rights. *Watson v. State, supra.* Therein, we recognized the advantages to both the innocent suspect and effective law enforcement.

> "Essential benefits thus accrue both to the police, who should not use valuable time in looking for the offender if an apprehended suspect goes unidentified, and the innocent suspect, who should not suffer undue custody awaiting police station identification. More importantly, prompt, yet fair, confrontations are reliable . . . ."

*Id.* at 740. In *Watson v. State, supra, Harris v. State, supra,* and *Smith v. State,* 352 A.2d 765 (1976), prompt on-the-scene show-ups were upheld as being an inseparable part of the offense's *res gestae* and necessary to proper policework. The rationale of those cases is controlling here. There was no reversible error in the show-up proceedings at the scene of the crime.

■ Nor is there merit in the charge of a constitutional violation for showing the defendants as a group to the individual witnesses at the scene. When judged under the totality of the circumstances, the allegation of unnecessary suggestiveness cannot be sustained. The fact that none of the witnesses was able to identify defendant Cook, while only two, out of the at least six persons present during the robbery, could identify Curran and Phelps, attest to the absence of suggestivity. Moreover, the defendants' argument further ignores the fact that the multiple showings did not occur until after the two witnesses who identified Curran and Phelps had viewed the men individually.

**V.**

Defendants Curran and Phelps contend that it was reversible error for defendant Cook's attorney to comment upon their failure to testify at the trial.[2] They argue that the comment suggested to the jury that an inference of guilt must be drawn from the failure to testify. Consequently, they contend, permitting such comment amounted to an invalid penalty upon the exercise of their constitutional right to remain silent. See *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, *reh. denied* 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967).

Although most cases which have considered the "comment" issue have involved statements by either the prosecutor or the Trial Judge, Curran and Phelps, in arguing that the rationale is equally applicable to statements made by counsel for a co-defendant, quote Judge Wisdom's observation that:

> "If comment on an accused's silence is improper for judge and prosecutor, it is because of the effect on the jury, not just because the comment comes from representatives of the State."

*De Luna v. United States,* (5 Cir.) 308 F.2d 140 (1962), *reh. denied* 324 F.2d 375 (1963).

■ While we agree with this observation, we do not believe that *De Luna,* or other cases in which such comment constituted error, are apposite to the present case. Those cases indicate that the right involved is the right to be free from "prejudicial" comment; at most, counsel's statement in the instant case was impartial and innocuous. See *United States v. Barney,* 371 F.2d 166 (7th Cir. 1966). At no point was there a suggestion that an inference of guilt be drawn from the defendants' silence

**2.** The alleged improper comment by counsel was substantially as follows:

> "[A]s you all are aware or will be made aware, the individuals are here before you today, Mr. Phelps, Mr. Cook and Mr. Curran, all have the constitutional right to remain silent. . . . However, some of the Defendants may take the stand. One of the Defendants may take the stand. The Defendant Cook, will take the stand. . . . There are a lot of good reasons why individu-

als perhaps should or should not take the stand. And as the judge will instruct you, if they do not take the stand, you are not to make any inference, whatsoever, from their silence. There may be perfectly good reasons why only one of the three people would testify what all three people did that day. . . . Therefore, take no note and draw no inference from the silence of any Defendant."

and, in fact, counsel expressly cautioned the jury not to make such an inference. Not every reference to the exercise of the right to remain silent mandates reversal. *Shantz v. State*, Del.Supr., 344 A.2d 245, 246–47 (1975). The determinative inquiry is whether the co-defendant utilized defendant's silence as a means of creating an inference of guilt. In this case it was not; accordingly, the allegation of error is without merit.

## VI.

All three defendants challenge the admissibility of the dog-tracking evidence in this case. The issue is one of first impression in Delaware.

The defendants urge upon us the rule requiring exclusion of dog-tracking evidence *per se*. This is the minority rule, first enunciated in *Brott v. State*, 70 Neb. 395, 97 N.W. 593 (1903).[3] See generally *Terrell v. State*, 3 Md.App. 340, 239 A.2d 128 (1968); Annot., 18 A.L.R.3d 1221 (1968). Generally speaking, the minority rule is based upon: (1) the unreliability of the dog's motivation; (2) the inability to cross-examine the dog; (3) the hearsay testimony of the handler; and (4) the undue prejudice such evidence has upon the jury.

■ It is our opinion that the rationale underlying the *per se* minority rule is unpersuasive. While it reflects a legitimate concern for the reliability of dog-tracking evidence, we think that the majority rule of admitting the evidence, once a "proper foundation" has been established, adequately safeguards against that concern.

■ Among the factors deemed prerequisite to such "proper foundation" are: (1) the experience and qualifications of the dog's handler; (2) the dog's experience, skill, training, and reputation as a tracker; and (3) the circumstances pertaining to the trailing itself. See *Terrell v. State, supra*,

239 A.2d at 133. While some jurisdictions have also required that the dog's pedigree be established, we agree with the more recent decisions rejecting that factor as a prerequisite to foundation and admissibility. See *Terrell v. State, supra* ; *State v. Rowland*, 263 N.C. 353, 139 S.E.2d 661 (1965).

■ In the instant case, we find that an acceptable foundation was established for the admission of the dog-tracking evidence. Testimony was adduced as to the training and experience of both the dog and its handler, as well as the dog's reliability. And evidence was also introduced to establish: that the area was protected until the dog's arrival; that the tracking was commenced within minutes of the suspects' flight into the woods; that the dog was allowed to pick up the defendants' scents by examining the abandoned vehicle; that the dog continued its tracking through the woods until the defendants were seen by the handler to be in the custody of the detaining officer; and, finally, the handler "back tracked" from the area of the defendants' custody to the point where the suspects first entered the woods.

Upon the basis of the evidence thus adduced, we are satisfied that a proper foundation was established and that the dog-tracking evidence was admissible in this case.

## VII.

In their final assertion of error, the defendants argue for a reconsideration of our present rule regarding the sufficiency of circumstantial evidence necessary to warrant a conviction.

■ We find no basis for overruling *Henry v. State*, Del.Supr., 298 A.2d 327 (1972), in which we held that circumstantial evidence, in order to support a finding of guilt, need no longer be inconsistent with

---

3. Those states which adhere to the "minority" position of *per se* exclusion are Illinois, Indiana, Iowa, Montana and Nebraska. In contrast, twenty two jurisdictions presently admit dog-tracking evidence: Alabama, Arkansas, Florida, Georgia, Kansas, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, and West Virginia. See 18 A.L.R.3d at 1225–26, 1228, 49–50 (Supp. 1976).

any other reasonable finding, but must be evaluated, like other evidence, under the "reasonable doubt" standard. That holding has been adhered to by this Court consistently, *e. g., Holden v. State*, Del.Supr., 305 A.2d 320 (1973); *Miller v. State*, Del.Supr., 310 A.2d 867 (1973); it continues to be the controlling standard by which to evaluate circumstantial evidence.

\* \* \* \* \* \*

Affirmed.