Jeffrey C. WILKIE, Appellant,

v.

STATE of Alaska, Appellee.

No. A–746.

Court of Appeals of Alaska.

March 21, 1986.

Jeffrey M. Feldman, Gilmore & Feldman, Anchorage, for appellant.

James V. Gould, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Harold M. Brown, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

Jeffrey C. Wilkie was convicted, following a jury trial, of sexual assault in the first degree, AS 11.41.410(a)(1). He appeals to this court raising several issues.

## FACTS

On October 1, 1983, S.C. left her residence in Eagle River at approximately 4:00 a.m. She worked the early morning shift at Anchorage International Airport for one of the airlines. Her shift began at 5:00 a.m., and she arrived at the employee parking lot at about 4:50–55 a.m. She opened her car door, then, seeing that someone was coming between her car and the adjacent car, started to close her door to allow him to pass. The man approaching did not pass; rather, he opened the door, told S.C. to move over, and said that he had a gun. S.C. complied, and the man entered the car and had intercourse with S.C. S.C. stated that the incident lasted "not more than ten minutes."

Moments after the assailant departed, Douglas Hansen, another airport employee, heard S.C. screaming for help and screaming that she had just been raped. Hansen spotted a man walking, then running, towards the international terminal of the airport. Both the man Hansen saw and the man described by S.C. were alleged to be wearing a dark-colored vest. Hansen determined that he could not catch the man, so he ran to the domestic terminal and reported the incident to police. The incident was recorded on police records at exactly 4:57 a.m.

The police responded immediately, calling in Officer Robert W. Jones and his dog Kai. Kai was placed next to the driver's side of S.C.'s vehicle to begin tracking. Kai began travelling towards the domestic terminal. Officer Jones stopped Kai and took him back to the driver's side of the car. This time Kai went to the back of the vehicle and signaled an alert. Again Jones started Kai, this time Kai started towards the international terminal. Jones encouraged Kai by shouting "good boy."

Before reaching the international terminal, Kai abruptly turned and circled a red pickup truck. Jones determined that no one was in the truck and returned with Kai

to his original track. Kai then went straight to the international terminal, entered, went to the Japan Airlines counter and jumped up on the counter. Seconds later, Jeffrey Wilkie, who was on the phone "popped up" from behind the counter. Other police officers were contacted, and Wilkie was arrested.

Wilkie's general appearance and clothing matched the description that S.C. had given to the police. However, S.C. was unable to identify Wilkie in a lineup, and, in an earlier photo montage of airport employees, picked out the picture of another person as possibly being the person who assaulted her. In addition, Wilkie presented evidence from alibi witnesses that at approximately the time of the sexual assault they saw Wilkie working near the terminal.

At trial, conflicting testimony was presented about physical evidence relating to the rape. An F.B.I. expert witness testified that he found hair identical to S.C.'s hair on clothing the police had seized from Wilkie. However, an expert witness who testified for Wilkie disputed this evidence and stated that the hair was Wilkie's own. An F.B.I. serology expert testified that semen stains, which were found on S.C.'s clothing, could have originated from Wilkie, but the expert admitted that approximately thirty-six percent of the male population of the United States were in the blood group from which the stain could have originated. A defense expert, Gary Harmor, testified that the semen stain could not have originated from Wilkie's subgrouping. After hearing the evidence, the jury convicted Wilkie of sexual assault in the first degree. Wilkie now appeals to this court. We affirm.

## GRAND JURY ISSUES

Wilkie argues that the trial court erred in refusing to dismiss the grand jury indict-ment against him based on several alleged errors.

### K.W. Information

At the grand jury proceedings, S.C. testified about her attempts to identify her assailant. S.C. testified that she was shown pictures of people who worked at the airport and that she had seen one picture that "scared her." S.C. stated that she brought the picture to the attention of the police as possibly being the picture of the person who assaulted her, although she was not sure of the identification. The photograph which S.C. identified was not of Wilkie, but of K.W., another person who worked at the airport. Later in the grand jury proceedings, a grand juror asked a police officer who had conducted part of the airport investigation, whether K.W. had been working that day. The prosecutor refused to allow the officer to respond to the grand juror's question on the basis that the response would be hearsay. Wilkie argues that it was error for the prosecutor not to allow the officer to respond and that the failure to produce further evidence concerning K.W.'s whereabouts constituted a failure to produce exculpatory evidence. *See* Alaska R.Crim.P. 6(q).[1]

 The state, pursuant to Criminal Rule 6(q), has an affirmative duty to present exculpatory evidence to the grand jury, so that the grand jury may properly perform its function of protecting the innocent from unjust prosecution. *See Frink v. State,* 597 P.2d 154, 164–65 (Alaska 1979) (quoting *State v. Gieffels,* 554 P.2d 460, 464 (Alaska 1976)). However, the duty to present exculpatory evidence imposes only an obligation to present evidence known to the prosecutor which tends to negate guilt. *Id.; see also* ABA Standards Relating to the Prosecution Function and Defense Function § 3.6(b) (Approved Draft 1971). In the present case, testimony at trial made

---

1. Alaska Rule of Criminal Procedure 6(q) reads:
 *Sufficiency of Evidence.* When the grand jury has reason to believe that other available evidence will explain away the charge, it shall order such evidence to be produced and for that purpose may require the prosecuting attorney to subpoena witnesses. An indictment shall not be found nor a presentment made upon the statement of a grand juror unless such grand juror is sworn and examined as a witness. The grand jury shall find an indictment when all the evidence taken together, if unexplained or contradicted, would warrant a conviction of the defendant.

it highly unlikely that K.W. was anywhere but at home during the time in question. It does not, therefore, appear that the additional evidence that the grand juror requested would have been exculpatory. Furthermore, the prosecutor demonstrated her willingness to answer the grand juror's question by calling additional witnesses, but the grand jury requested deliberations instead, returning a true bill. We find no error.

### Lack of Lineup Testimony

The prosecution did not conduct a lineup to see if S.C. could identify Wilkie until after the grand jury proceedings. One of the grand jurors asked why no lineup had been conducted. The prosecutor responded that the reason why no lineup had been conducted was not relevant and told the grand jury to consider only the evidence presented. Wilkie argues that the indictment should have been dismissed because of the prosecutor's response. We disagree.

 The evidence presented to the grand jury made it clear that S.C. had not identified Wilkie as the person who assaulted her and that she had picked out the photograph of K.W. as a suspect. Hence, all exculpatory evidence regarding identification was reasonably and fairly presented. *See Frink*, 597 P.2d at 166. We see no evidence of bad faith in the failure of the prosecution to conduct a lineup prior to the grand jury proceedings. On this record, we do not believe that the indictment should have been dismissed because the prosecutor told the grand jury that the reason why no lineup had been conducted was irrelevant.

### Times on Chart

Several airport employees who worked with Wilkie testified regarding where and when Wilkie had been seen at work. Carl Burford testified that he saw Wilkie load a China Airlines jet at 4:40—4:45 a.m. and that Wilkie was present when the China Airlines jet departed. It is undisputed that the China Airlines plane backed out at 4:50 a.m. Since the sexual assault of S.C. was reported at 4:57 a.m., Burford's testimony tended to establish an alibi for Wilkie.

The prosecutor wrote down the times of events concerning the rape on a chart. The prosecutor included the time that Wilkie loaded the jet (4:40–4:45) on the chart but did not write down the time that Wilkie was seen watching the jet depart (4:50). Wilkie argues that the prosecutor thus misled the grand jury and that the trial court was therefore required to dismiss the indictment.

 Where an inaccuracy in the evidence presented to the grand jury occurs, the indictment must be dismissed only where the inaccuracy is material. *Keith v. State*, 612 P.2d 977, 980–981 (Alaska 1980). We find the present case analogous to what transpired in *Doisher v. State*, 632 P.2d 242, 251 (Alaska App.1981) *rev'd on other grounds*, 658 P.2d 119 (Alaska 1983). In *Doisher*, accurate evidence was presented to the grand jury. However, in her summation, the prosecutor misstated the evidence without any apparent bad faith. *Id.* As in *Doisher*, the prosecutor here presented the evidence which tended to prove Wilkie's alibi but did not include it on the chart, without any apparent bad faith. We find the prosecutor's apparently inadvertent omission of the time from her chart immaterial and insufficient to mandate reversal.

 Wilkie also argues that the indictment should have been dismissed because of cumulative error. We disagree that the alleged errors, considered as a whole, required the trial court to dismiss the indictment.

## TRACKING DOG EVIDENCE

Wilkie argues that the trial court erred in admitting evidence that Kai, a German Shepherd police dog, tracked Wilkie from the crime scene to the counter at the international terminal. First, Wilkie argues that dog tracking evidence should never be admitted into evidence. Second, he argues that if dog tracking evidence may be admitted, there was an insufficient foundation to admit the evidence in this case.

The question of whether to admit evidence that a dog tracked a particular suspect is a case of first impression in Alaska. There is a split of authority in other jurisdictions whether to admit this kind of evidence. However, the large majority of jurisdictions appear to admit this evidence if a proper foundation has been established. *See* Annot., 18 A.L.R.3d 1221 (1968). The rationale for excluding dog tracking evidence was summarized in *Cook v. State*, 374 A.2d 264, 270 (Del.1977):

> Generally speaking, the minority rule is based upon: (1) the unreliability of the dog's motivation; (2) the inability to cross-examine the dog; (3) the hearsay testimony of the handler; and (4) the undue prejudice such evidence has upon the jury.

In *Cook*, the Supreme Court of Delaware found this reasoning unpersuasive. We agree with the Delaware court that the proper question is whether a sufficient foundation has been laid to establish the reliability of the dog tracking evidence. The *Cook* court set out the following factors as foundational prerequisites for admission of dog tracking testimony:

> (1) the experience and qualifications of the dog's handler; (2) the dog's experience, skill, training, and reputation as a tracker; and (3) the circumstances pertaining to the trailing itself.

*Id.*

■ We concur that if these factors have been adequately established, tracking dog evidence should be admissible. The fact that dogs can track people seems to be adequately established and is admissible in a large majority of jurisdictions. To the extent there are questions about this kind of evidence, the parties to a particular case can rely on expert witnesses to aid the jury in determining the weight to give such testimony. We have confidence in the jury's ability to critically evaluate this kind of evidence and to give it proper weight.

Wilkie argues that the state did not establish a sufficient foundation for the admission of the dog tracking testimony. However, the state presented testimony by the officer who handled Kai about Kai's training and experience. Officer R.W. Jones testified that Kai had been trained in Germany for two and one-half years for tracking, obedience, and handler protection. He testified to personally working with Kai for six weeks in Connecticut, and testified that a part of that training was in tracking. Officer Jones described his training with Kai and the theories regarding how a dog tracks. He testified that Kai had been used for tracking in actual cases and had tracked suspects.[2] Jones additionally testified about Kai's ability to detect drugs and narrated three video tapes which showed Kai demonstrating his tracking abilities. Jones then explained the circumstances surrounding Kai's tracking of Wilkie on the morning that S.C. was assaulted.

■ We believe that this testimony established a sufficient foundation to admit the evidence suggesting that Kai tracked Wilkie. It appears that there was sufficient evidence that Officer Jones had the experience and the qualifications necessary to testify as an expert dog handler. There was sufficient evidence that Kai had the training and ability to track people. There was also sufficient evidence that the conditions for tracking on the day of the sexual assault were good. We believe that this was a sufficient foundation to admit the evidence that Kai apparently tracked Wilkie, and any alleged weakness goes to the weight of the evidence, not its admissibility.[3]

2. Wilkie points out that Officer Jones did not *describe* any of the tracking which took place, or Kai's rate of success. However, under the discovery procedures, Wilkie's counsel was entitled to learn of Kai's prior tracking experience, and it appears that Wilkie's counsel was given a tracking log which showed Kai's prior tracking experience. Under these circumstances, if there was a weakness in Kai's prior experience in actual cases, we believe that defense counsel should have at least specifically objected and required the state to produce further evidence of Kai's experience in actual cases, or attack the weight of the tracking evidence.

3. We note that the trial court gave an instruction which indicated that the evidence regarding the use of a tracking dog should be viewed with caution.

## POLYGRAPH RESULTS

■ Wilkie contends that the trial court erred in not admitting evidence of two polygraph examinations that were favorable to him. Courts in this state have consistently held that polygraph evidence is inadmissible. *See Pulakis v. State*, 476 P.2d 474, 479 (Alaska 1970); *Leonard v. State*, 655 P.2d 766, 767–771 (Alaska App.1982). We see no reason, on this record, to conclude that polygraph testing has reached a level of reliability to allow its admission into evidence.

## VERIFICATION OF DEFENSE EXPERT

The state called a serologist to testify that the semen stain on S.C.'s skirt matched Wilkie's blood type—a blood type common to thirty-six percent of the population. Wilkie called an expert witness, Gary Harmor, who testified that while the state's serologist's conclusions were correct, a further test can be applied whereby blood types can be broken down into subparts. Utilizing this test, Harmor concluded that the semen stains did not match Wilkie's blood subpart. Harmor therefore concluded that Wilkie could not have produced the semen stain which was found on S.C.'s skirt.

Apparently, to reach the conclusion which he reached, Harmor performed certain tests and, as a result, observed certain enzyme activity. According to Harmor, the presence of this enzyme activity led to the conclusion that the semen stain could not have originated from Wilkie. At trial, Wilkie wanted to have Harmor establish that he was not the only one who observed the critical enzyme activity. Apparently other experts in the laboratory had observed the enzyme activity and agreed with Harmor's observation. However, the state asked for a protective order forbidding this testimony. Judge Buckalew granted the

protective order, refusing to allow the testimony on hearsay grounds. On cross-examination of Harmor, the state established that Harmor's testimony was based upon his observations and that it was theoretically possible that another expert might look at the same test and reach a different conclusion. Following cross-examination, Wilkie contended that the state's cross-examination had opened the door to evidence that Harmor's observations had been confirmed by other people in the laboratory and that·the protective order should be quashed. Judge Buckalew again refused to allow Wilkie to present the testimony. On appeal, Wilkie contends that the refusal to allow this testimony was error.

■ Harmor's testimony, that other experts in his laboratory had observed his results and concurred, could be admitted for a legitimate non-hearsay purpose to demonstrate the laboratory procedures followed and to show that the tests were conducted carefully. However, there was also an obvious danger that the fact that other experts had apparently confirmed Harmor's results would be used to establish that, had they been called, the other experts would have testified in the same manner as Harmor. This would have essentially allowed the defense to appear to be presenting the testimony of these other experts without subjecting them to cross-examination. Thus, the trial judge could properly determine that this testimony was hearsay and could properly exclude it. We do not believe that the trial court judge abused his discretion in refusing to initially allow this testimony.[4]

■ The question of whether the trial judge should have allowed this testimony following the state's cross-examination presents a closer question. However, on balance we do not believe that the state's suggestion, that Harmor's observations

---

**4.** In *some instances*, hearsay is admissible through expert witnesses if the evidence constitutes "[f]acts or data ... of a type reasonably relied upon by experts in the ... field." A.R.E. 703. While verification and concurrence by colleagues may be facts or data reasonably relied upon in some circumstances, Harmor clearly

came to his conclusions based upon his own observations. Evidence Rule 703 allows hearsay to the extent necessary to lay the foundation for the testifying expert. Here, the hearsay would be offered merely to enter opinions of experts not present in court.

were to some extent subjective or that it was possible that another expert might not agree with Harmor's observations, required the trial judge to rule that Harmor could testify that other people in his laboratory had apparently agreed with his opinion concerning the enzyme activity. We find that Judge Buckalew acted within his discretion in refusing to allow Harmor's colleague's observations.

The conviction is AFFIRMED.