# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| **STATE OF DELAWARE**, | ) | |
| | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **ID. No. 1307023034** |
| | ) | |
| | ) | |
| **MICHAEL PARKS** | ) | |

Submitted: May 30, 2014
Decided: May 30, 2014
Decision Issued: June 24, 2014
Corrected: July 8, 2014[*]

## OPINION

*Upon Defendant, Michael Parks's, Motion to Suppress*,
**DENIED IN PART, AND GRANTED IN PART**.

Daniel B. McBride, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware, for the State of Delaware.

Sean A. Motoyoshi, Esquire, Assistant Public Defender, Office of the Public Defender, Wilmington, Delaware, for Defendant Michael Parks.

**WALLACE, J.**

_____
[*]   This corrected opinion is issued simply to address a typographical error; footnote 46 was duplicated in the original opinion.

## I.    INTRODUCTION

Defendant Michael Parks ("Parks") was arrested on July 28, 2013 for a series of burglaries committed in New Castle County and in New Castle City beginning on the 4th of July. Police participating in a surveillance operation covering the neighborhoods recently hit by these burglaries observed Parks riding a bicycle – the mode of transportation that police believed the burglar was using – at approximately 1:30 a.m. – the dead-of-night hour at which the previous burglaries had occurred. Parks rode away from a surveillance officer whom he had spotted, rode through a closed county park, and rode onto a recreation trail known as the Greenway Trail – the route of travel and source of ingress points the police had deduced the burglar was using to get to the victimized neighborhoods. While on the Greenway Trail, surveilling undercover officers detained Parks. He was in possession of a lady's purse that had been taken that night from a burglarized home near where the first officer had seen him. Parks has been charged with eleven counts stemming from multiple burglaries. He asks this Court to grant his motion to suppress evidence the police obtained during his detention on Greenway Trail and clothing that was seized later at the police station. For the reasons set forth below, his motion is **GRANTED** as it relates to his clothing seized while in police custody, and **DENIED** as to other evidence and any statements obtained following the investigative stop.

-1-

## II.   FACTUAL AND PROCEDURAL BACKGROUND

The Greenway Trail is an off-road recreational trail facility that will eventually connect the cities of Wilmington and New Castle.  The completed lower end runs from around Eighth Street in New Castle City northward to Boulden Boulevard in an unincorporated area of New Castle County.[1]  During July of 2013, a spate of residential burglaries struck neighborhoods adjoining that lower end of the trail.  The crimes concentrated in two clusters spanning two police jurisdictions: New Castle County ("County Police") and New Castle City ("City Police").[2]

Between July 4 and July 25, 2013, there were multiple home burglaries in the adjoining neighborhoods of Wilmington Manor Gardens and Jefferson Farms (collectively the "County burglaries").[3]  Between July 6 and July 20, 2013 there were twice as many home burglaries reported in the eastern portion of New Castle City (collectively the "New Castle City burglaries").[4]

Through the investigative efforts of the two police departments' detectives, it was determined that the many burglaries were likely related.  When the City

---

[1]    *State's Exh. A*, Supp. Hrg. Tr., Mar. 14, 2014; Supp. Hrg. Tr., Mar. 14, 2014, at 6-8 (hereinafter "Supp. Hrg. at __").

[2]    *State's Exh. A*; Supp. Hrg. at 61-66.

[3]    *State's Exh. A*; Supp. Hrg. at 6-10, 58-61.

[4]    *State's Exh. A*; Supp. Hrg. at 6, 62-64.

Police "flooded their jurisdiction with extra police vehicles," the New Castle City burglaries abated while the County burglaries increased.[5]  And the investigators derived numerous similarities in the burglaries.  Each burglary occurred within the same time frame, between 11:00 p.m. and roughly 5:00 a.m.;[6] in each burglary, the homeowners were home when the incursion occurred;[7] in each burglary similar items were stolen—purses, wallets, and checkbooks.[8]

The burglaries also had another key similarity: proximity to the Greenway Trail.  The northern end of this stretch divides the neighborhoods of Wilmington Manor Gardens and Jefferson Farms, running near many of the homes that were burglarized.  Its southern end terminates inside the city limits, just blocks from the locations of many of the New Castle City burglaries.

Recognizing the similarities between the County burglaries and the New Castle City burglaries, the County and City Police increased vehicular patrols in the area yet were unsuccessful in identifying a suspect.  This led the police to deduce that the perpetrator was traveling on foot or by bicycle using the Greenway

---

[5]     Supp. Hrg. at 63-64.

[6]     Supp. Hrg. at 11, 58.

[7]     Supp. Hrg. at 58, 60, 62.

[8]     Supp. Hrg. at 11, 59, 62, 73.

Trail as the corridor and ingress point to the victim neighborhoods.[9]  In turn, on July 25, 2013, they began nightly surveillance operations in the neighborhoods connected to the Greenway Trial and on the Greenway Trial itself.  On July 28, 2013, County Police Sergeant Astfalk, an officer participating in the surveillance, was parked in an undercover car at an intersection in Wilmington Manor Gardens.[10]  Sergeant Astfalk observed a man, later identified as Defendant Michael Parks, riding a beach-cruiser style bicycle traveling quickly on Vassar Avenue (a street that had already been struck twice with burglaries)[11] at approximately 1:30 a.m.[12]  Sergeant Astfalk further observed that the bicycle that Parks was riding did not have a head lamp.[13]

Parks apparently noticed Sergeant Astfalk's vehicle, which was parked on the street with its exterior lights on.  When he did, Parks changed direction and rode in circles in the street while watching Sergeant Astfalk's vehicle.[14]  Parks then traveled northbound on Notre Dame Avenue and Sergeant Astfalk began to follow

---

[9]     Supp. Hrg. at 9-10, 65-66.

[10]    Supp. Hrg. at 13.

[11]    Supp. Hrg. at 58-59.

[12]    Supp. Hrg. at 14.

[13]    Supp. Hrg. at 16.

[14]    Supp. Hrg. at 15-16, 26.

about one-half block behind.[15]  Parks then turned right into the county parkland bordering Wilmington Manor Gardens.  Sergeant Astfalk last observed Parks riding in the park toward the Greenway Trail.  The sergeant reported this information via radio to the other officers in the area, including the surveilling officers positioned on the Greenway Trail.[16]

County Police Detective Eckerd was on the surveillance team, positioned on foot on the Greenway Trail, and heard Sergeant Astfalk's radio transmissions.[17] Detective Eckerd initially saw Parks leaving the closed parkland a couple of minutes after Sergeant Astfalk last reported seeing him.[18]  Parks was first walking beside the bicycle and then riding the bike towards Detective Eckerd's position.[19] It was very dark on the Greenway Trail at this time, but Detective Eckerd was wearing night vision goggles and therefore was able to clearly see Parks's actions.[20]  When Parks was roughly ten feet from Detective Eckerd's position, Detective Eckerd turned on his flashlight and announced himself.[21]  Parks

---

[15]     Supp. Hrg. at 17.

[16]     Supp. Hrg. at 17-19, 29-30.

[17]     Supp. Hrg. at 36-37, 40, 45-46.

[18]     Supp. Hrg. at 18-20.

[19]     Supp. Hrg. at 40-42, 47-48.

[20]     Supp. Hrg. at 17, 21, 40-41, 45-48.

[21]     Supp. Hrg. at 41-42, 48-49.

screamed and jumped or fell off of his bicycle. The bike continued to roll past Detective Eckerd and his surveillance partner riderless, crashing nearby.[22] Parks seemed "in total shock" to have encountered the police on the trail. Realizing this, the police "put [Parks] down on the ground and, then, [they] just cuffed him up."[23] The police then immediately retrieved Parks's bicycle and saw a lady's purse on its handlebars.[24]

Parks was transported to the County Police headquarters, where an evidence officer seized his clothing and sneakers.[25] He is now charged in an eleven-count indictment: five counts of second degree burglary; one count of attempted second degree burglary; and five counts of felony theft.[26]

Parks makes three claims in his suppression motion and his supporting oral arguments: (1) the police lacked the reasonable, articulable suspicion required to detain him on the Greenway Trail; (2) even if the police could validly stop Parks, he was immediately subjected to a "full-fledged arrest" and so suppression is

---

[22]    Supp. Hrg. at 42-43, 48-49.

[23]    Supp. Hrg. at 18-20.

[24]    Supp. Hrg. at 49-51. Police quickly determined that the purse belonged to a victim whose home had been burglarized that night, but who had not yet realized the burglary had occurred when the police arrived there. Supp. Hrg. at 70-71.

[25]    Supp. Hrg. at 72-73.

[26]    DEL. CODE ANN. tit. 11, § 825 (2013); *id.* at §§ 531, 825; *id.* at § 841.

required;[27] and (3) the seizure of Parks's clothing and sneakers without a warrant precludes their use as evidence at trial.[28]

## III. DISCUSSION

### A. The Police possessed the requisite reasonable articulable suspicion[29] to detain Parks.

It is well settled that absent some reasonable and articulable suspicion, detaining an individual for investigatory purposes violates his right to be free from unreasonable searches and seizures.[30] Protection from such seizures is provided under the Fourth Amendment to the United States Constitution[31] and in Article I, § 6 of the Delaware Constitution.[32] Consistent with this broad protection afforded

---

[27] Supp. Hrg. at 86-88; 111-15.

[28] For the reasons set forth more fully on the conference record of this matter on May 31, 2014, the Court granted suppression of Parks's clothing. Accordingly, that claim is not addressed in detail in this opinion.

[29] Parks posits, both in his moving papers and at argument, that *McDonald v. State*, 947 A.2d 1073 (Del. 2008), somehow cabins the evidence this Court can consider in examining the police conduct related to his detention. But Parks has not adequately articulated how *McDonald* would apply or what specific facts or testimony this Court cannot consider. *See* Supp. Hrg. at 79-83. That is because the almost singular set of circumstances that led to the *McDonald* decision is not present and its holding has no applicability here.

[30] *Terry v. Ohio*, 392 U.S. 1, 9, 21 (1968); *Jones v. State*, 745 A.2d 856, 860 (Del. 1999).

[31] U.S. CONST. amend. IV. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (Fourth Amendment's "protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest").

[32] DEL. CONST. art. I, § 6. *State v. Moore*, 997 A.2d 656, 663 (Del. 2010) ("The right of Delaware citizens is further secured by Article I, § 6 of the Delaware Constitution.").

by both constitutions,[33] however, a police officer may conduct an investigatory stop of a person abroad based on the officer's reasonable and articulable suspicion that criminal activity has occurred, is occurring, or is about to occur.[34]

A reasonable and articulable suspicion[35] is defined as an "officer's ability 'to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant the intrusion.'"[36] "In determining whether reasonable articulable suspicion exists, [the Court] 'must examine the totality of the circumstances surrounding the situation as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts.'"[37] It "is a less demanding standard than probable cause and requires a showing

---

[33] Delaware has, in part, also codified this protection from unreasonable seizures of one's person at 11 *Del. C.* § 1902(a).

[34] *Thomas v. State*, 8 A.3d 1195, 1198 (Del. 2010) (in this regard, Delaware follows the *Terry* standard: "[A]n officer is justified in stopping an individual when the officer possesses a reasonable, articulable suspicion that the individual was committing, had committed, or was about to commit a crime.").

[35] Section 1902(a) of Title 11 states that a detaining officer must have a "reasonable ground to suspect [the person] is committing, has committed or is about to commit a crime . . . ." "'[R]easonable ground' as used in Section 1902(a) has the same meaning as reasonable and articulable suspicion." *Jones*, 745 A.2d at 861.

[36] *Holden v. State*, 23 A.3d 843, 847 (Del. 2011) (citation omitted); *Jones*, 745 A.2d at 861 (quoting *Terry*, 392 U.S. at 21).

[37] *Id.* (citation omitted).

considerably less than preponderance of the evidence . . . ."[38]  But simply put, an objective standard must be met: "would the facts available to the officer at the moment of the seizure . . . 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"[39]

In this case, the police possessed the requisite suspicion necessary to stop Parks on Greenway Trail.[40]  The County and City Police had been engaging a concerted investigation into a string of burglaries of occupied dwellings that had been occurring for almost a month.  Significant similarities existed among the crimes, through which the investigating detectives had established the burglar's *modus operandi*.[41]  The officers' knowledge of the burglaries' similarities—

---

[38]  *Woody v. State*, 765 A.2d 1257, 1263 (Del. 2001).  *Arvizu*, 534 U.S. at 273-74 ("Although an officer's reliance on a mere 'hunch' is insufficient to justify an investigatory stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.") (internal citations omitted).

[39]  *Terry*, 392 U.S. at 21.  *See United States v. Cortez*, 449 U.S. 411, 417 (1981) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity"); *see also Arvizu*, 534 U.S. at 273 (Court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing"). *Hicks v. State*, 631 A.2d 6, 9 (Del. 1993) (police officer must be able to "point to *specific and articulable facts* which, taken together with all rational inferences from those facts, reasonably warrant the intrusion.")(emphasis in original).

[40]  That Detective Eckerd made the stop while Sergeant Astfalk made many salient observations is of no moment.  Detective Eckerd was "entitled to rely on information relayed to him through official channels," and therefore he could validly stop Parks based on the information given to him by Sergeant Astfalk. *Thomas*, 8 A.3d 1195 (Del. 2010). *See State v. Cooley*, 457 A.2d 352, 355 (Del. 1983).

[41]  Supp. Hrg. at 62-65.

including the likely avenue of access and means of travel—was articulated in support of the police officers' reasonable suspicion. Sergeant Astfalk observed Parks on Vassar Avenue in Wilmington Manor Gardens riding a bicycle at about 1:30 a.m.; that is, he saw Parks on a street that had been hit twice already, at an odd hour for bike traffic, that coincided with the time homes were being burglarized (rather than the activity of the normal biking public), and on the conveyance the police surmised the burglar used to get to the victims' homes. Sergeant Astfalk saw Parks's atypical reaction to his presence: that is, Parks, seemingly anxious over the police presence, circled in the street and checked the officer out. And then, unprovoked, Parks fled into the closed parkland abutting the Greenway Trail.[42]

Given the totality of the circumstances, Sergeant Astfalk had reasonable ground to suspect that Parks committed or was about to commit a crime.[43] Upon receiving Sergeant Astfalk's radio report of Parks's conduct, and observing Parks traveling on the Greenway Trail shortly thereafter—coupled with the fact that during two nights of observation, Parks was the first and only person seen traveling

---

[42] Unprovoked flight and presence in an area associated with crime are not independently sufficient to support reasonable articulable suspicion, but they may be factors considered in the totality of the circumstances analysis. *See Riley v. State*, 892 A.2d 370, 376 (Del. 2006); *Woody*, 765 A.2d at 1265.

[43] *Arvizu*, 534 U.S. at 273 ("the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot'").

on Greenway Trail during the relevant time period—Detective Eckerd had reasonable articulable suspicion to detain him.[44]

Police officers' "'subjective impressions or hunches' are insufficient for a stop."[45] Still, in some circumstances, "lawful and apparently innocent conduct[46] may add up to reasonable suspicion if the detaining officer[s] articulate[] 'concrete reasons for such an interpretation.'"[47] Some of Parks's actions could well have been viewed as "lawful and apparently innocent" in isolation. But here the officers articulated "concrete reasons" for their suspicion.[48] Viewing the events "through the eyes of a reasonable, trained police officer in the same or similar

---

[44]    *See United States v. McGuire*, 2007 WL 4322164 (6th Cir. Dec. 10, 2007) (officer had reasonable articulable suspicion that defendant might have been engaged in criminal activity when, at 1:00 a.m., while patrolling in an area of the county that had experienced a number of recent burglaries, he noticed two people sitting in a vehicle that had its headlights and engine turned off and that was parked at the very end of a long driveway to a private residence); *see also State v. McCormack*, 33 A.3d 264, 271-73 (Conn. 2011) (reasonable articulable suspicion where defendant was observed in the same residential area where a series of burglaries had occurred within the previous month, was there at the same approximate time of day when those burglaries occurred, and when he met certain identifiers the police had developed through investigation).

[45]    *Lopez-Vazquez v. State*, 956 A.2d 1280, 1288 (Del. 2008) (quoting *Terry,* 391 U.S. at 27).

[46]    The State contends that, even if reasonable articulable suspicion arising from the serial burglary investigation was not established, Parks's detention was valid because he was observed violating 21 *Del. C.* § 4198F(a) (2013) (operating a bicycle at night without a headlamp) and New Castle County Code §24.01.002 (presence in a park after dark without a permit). Because the Court has determined that there was reasonable articulable suspicion to detain Parks arising from the burglary investigation and the officers' observations during the surveillance, the Court need not and has not relied upon the State's alternative arguments.

[47]    *Riley*, 892 A.2d at 375 (quoting *Harris v. State*, 806 A.2d 119, 121 (Del. 2002)).

[48]    *See Riley*, 892 A.2d at 375.

circumstances," the officers had reasonable articulable suspicion that Parks had committed or was about to commit a crime.[49]

Parks's detention was not based on a mere "inchoate and unparticularized suspicion or 'hunch.'"[50] Parks's behavior when he observed the surveilling Sergeant Astfalk, and the police officers' "commonsense judgments and inferences about human behavior"[51] reasonably warranted their suspicion.[52] "The ultimate question is whether [] reasonable, trained officer[s] standing in [these officers'] shoes could articulate specific reasons justifying [Parks]'s detention."[53] Here they could and they did. Parks's initial detention was valid because the facts available to the officers "at the moment of the seizure . . . 'warrant[ed] a man of reasonable caution in the belief' that the action taken was appropriate[.]"[54]

---

[49] *See Hicks*, 631 A.2d at 9.

[50] *Terry*, 392 U.S. at 27.

[51] *Illinois v. Wardlow,* 528 U.S. 119, 125 (2000); *see also Arvizu*, 534 U.S. at 273 (police officers effecting a seizure must be allowed to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them").

[52] *Hicks*, 631 A.2d at 9.

[53] *Johnson v. Campbell,* 332 F.3d 199, 206 (3d Cir. 2003).

[54] *Terry*, 392 U.S. at 21.

**B. Detective Eckerd's restraint of Parks with handcuffs on the Greenway Trail was neither unreasonable nor did it lead to the discovery of evidence that would not have been otherwise immediately apparent to him.**

Parks argues that because he was subjected to a degree of initial force or restraint beyond that generally employed in a *Terry* stop,[55] the Court should order suppression of any and all evidence detected from the moment Detective Eckerd initiated his investigatory stop with such force or restraint. In Parks's view, he was subjected to an immediate arrest without probable cause. But it cannot be said that whenever the police consummate a stop by force or restraint, the seizure must be deemed an arrest rather than a stop, and may be upheld only if full probable cause was then present.[56] "This is not to suggest that in the course of stopping suspects for investigation the police may, as a matter of routine, utilize modes of restraint which might commonly be employed incident to arrest."[57] Still there has been and can be no bright line drawn between the permissible and impermissible degree of

---

[55] It is inarguable that Parks was *seized* immediately upon his encounter with Detective Eckerd. *See Curtis v. State*, 2011 WL 825827, at *2 (Del. Mar. 9, 2011) (In Delaware "to determine when a seizure has occurred . . . we 'focus[ ] upon the police officer's actions to determine when a reasonable person would have believed he or she was not free to ignore the police presence.'" ).

[56] *See* 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 9.2(d) at 405-06 (5th ed. 2012) (noting that depending on the circumstances "grabbing the suspect's arm, taking the suspect to the ground or ordering him to lie on the ground will be permissible" during an investigatory detention).

[57] *Id.* at 406.

force or modes of restraint for an investigative detention.[58]  Instead, whether the means used to effect or the circumstances of an investigatory stop were reasonable must be decided on a case-by-case basis.

Here Detective Eckerd had been briefed on the investigation and why he was stationed where he was.  While on surveillance, Detective Eckerd was warned by Sergeant Astfalk via radio that Parks was headed toward him.  The detective watched, using night-vision goggles, as Parks went from walking a bicycle to riding it on the trail toward him.  When Parks was immediately in front of Detective Eckerd, the detective turned on his flashlight, announced himself as a police officer and told Parks to get off the bike and get to the ground.  Parks reacted with a scream as he hopped off of the still-rolling bicycle.  The bike continued on its own past the officer and crashed close by.  Detective Eckerd and his surveillance partner helped Parks to the ground and handcuffed him.  They then immediately retrieved Parks's bicycle, noticing instantly that a lady's purse was on its handlebars.

Given the nature of the crimes suspected here – multiple nighttime burglaries of occupied homes; the location of the stop here – an isolated portion of

---

[58]     *See United States v. Sharpe*, 470 U.S. 675, 685 ("Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria."); *see also United States v. Johnson*, 592 F.3d 442, 447-48 (3d Cir. 2010) ("In certain circumstances, it can be difficult to distinguish between a *Terry* stop, which requires only reasonable suspicion, and a *de facto* arrest, which must be supported by probable cause.").

an off-road trail on which the police had seen no one traveling during consecutive nights of surveillance; and the dead-of-night hour here – 1:30 a.m. when "[i]t was very, very dark . . . like, shut-your-eyes dark,"[59] the immediate use of a shining flashlight and verbal command to detain Parks was reasonable.[60] So, too, was the immediate use of handcuffs a reasonable step to ensure Parks was secure before investigating further.[61]

But even if the greater degree of initial restraint of Parks alone somehow converted the initial encounter from a valid investigatory detention to an arrest, suppression is not justified here. Parks has failed to articulate the required causal nexus[62] between the over-restraint he alleges and the evidence he seeks to have

---

[59]     Supp. Hrg. at 45, 48.

[60]     *See Gallegos v. City of Los Angeles*, 308 F.3d 987, 991 (9th Cir. 2002) (inquiry into reasonableness of a seizure requires a court "to consider 'all the circumstances surrounding the encounter' between the individual and the police 'by evaluating not only how intrusive the stop was, but also whether the methods used [by police] were reasonable *given the specific circumstances*'") (emphasis in original)(internal citations omitted); *id.* at 991-92 (pulling over burglary suspect, ordering him out of his truck at gunpoint, handcuffing him, and placing him in the back of a patrol car did not exceed the bounds of a valid investigatory stop); *see also State v. Rawlings*, 829 P.2d 520 (Idaho 1992) (investigative stop of burglary suspect in pre-dawn hours not converted into an arrest when a police officer took reasonable precaution of drawing weapon to secure suspect and conduct further investigation).

[61]     *Johnson*, 592 F.3d at 448 ("[P]lacing a suspect in handcuffs while securing a location or conducting an investigation [does not] automatically transform an otherwise-valid *Terry* stop into a full-blown arrest.").

[62]     *See United States v. Mosley*, 454 F.3d 249, 254 (3d Cir. 2006) (discussing the well-accepted "commonsense proposition that a single Fourth Amendment violation does not taint an entire case, but only the evidence uncovered as a result of that violation").

suppressed.[63] As is clarified through the discussion below, there truly is none. And on this basis alone, this claim fails.

### C. Application of the inevitable discovery exception warranted and also allows for admission of evidence arising from Parks's investigative detention.

Delaware has long accepted and consistently applied the inevitable discovery exception to the exclusionary rule.[64] This exception "provides that evidence, obtained in the course of illegal police conduct, will not be suppressed if the prosecution can prove that the incriminating evidence 'would have been discovered through legitimate means in the absence of official misconduct.'"[65]

> The majority of the cases employing the inevitable discovery exception involve instances in which the illegal police conduct occurred while an investigation was already in progress and resulted in the discovery of evidence that would have eventually been obtained through routine police investigatory procedure. The illegalities in such cases, therefore, had the effect of simply accelerating the discovery.[66]

---

[63]     *See* Supp. Hrg. at 111-15.

[64]     *Cook v. State,* 374 A.2d 264, 267-68 (Del. 1977); *Martin v. State,* 433 A.2d 1025 (Del. 1981); *Rew v. State*, 1993 WL 61705 (Del. Feb. 25, 1993); *Hardin v. State*, 844 A.2d 982 (Del. 2004); *Thomas v. State*, 8 A.3d 1195 (Del. 2010); *Roy v. State*, 62 A.3d 1183 (Del. 2012).

[65]     *Cook,* 374 A.2d at 267-68 (quoting Harold S. Novikoff, Comment, *The Inevitable Discovery Exception to the Constitutional Exclusionary Rules*, 74 COLUM. L. REV. 88, 90 (1974)).

[66]     *Id.* at 268 (quoting Novikoff, 74 COLUM. L. REV. at 91).

And Delaware's courts have applied the doctrine previously in just such factual situations.[67]

Yet here the officers' alleged constitutionally offensive conduct – placing Parks to the ground and cuffing him – did not accelerate the discovery of incriminating evidence, but actually delayed it briefly. This peculiar confluence of circumstances likewise warrants the application of the inevitable discovery doctrine. The discovery of the purse was set back momentarily by Parks's stunned reaction and loss of control of his bicycle. The police immediately picked up the bike that Parks would have been astride and then saw the purse on its handlebars. But if Detective Eckerd had conducted the investigatory stop in a manner so that Parks merely stopped his bicycle to be questioned or further investigated as Parks asserts he should have,[68] the lady's purse would have been dangling between them in open view. Thus, the very evidence Parks admits would have given the police

---

[67]    *E.g., Roy v. State*, 62 A.3d 1183 (Del. 2012) (while police officers lacked reasonable suspicion connecting the defendant to crime to conduct an investigatory stop, the physical evidence discovered during the defendant's illegal detention would have been inevitably discovered through proper police conduct after the murder victim's body was discovered); *Cook v. State,* 374 A.2d 264 (Del. 1977) (even if the seizure of currency was beyond the scope of a reasonable search for weapons, the money would have been discovered during the course of an inventory search of the defendant subsequent to arrest); *State v. Banner,* 2011 WL 7054606 (Del. Super. Ct. Dec. 22, 2011) (seizure of the shotgun and shotgun shells, whether or not supported by probable cause, would have occurred in any event during the course of officer's lawful inventory search of the vehicle).

[68]    Supp. Hrg. at 112-15.

probable cause to arrest him[69] would not have just been discovered inevitably, it would have been discovered immediately.[70] That purse and any other evidence seized as a result of Parks's investigatory detention on Greenway Trail are therefore admissible under the inevitable discovery doctrine.

## IV. CONCLUSION

Parks's investigatory detention on the Greenway Trail at 1:30 a.m. on July 28, 2013, was adequately supported by reasonable articulable suspicion related to the investigation of the serial burglary spree that had been occurring in the adjoining neighborhoods during the weeks prior. The methods of affecting that detention – use of a flashlight to alert Parks to the police's presence, a coinciding command to go to the ground, and immediate use of handcuffs – were reasonable given the circumstances the seizing officer then faced. But even if that degree of restraint could be viewed as crossing the divide between reasonable and unreasonable police conduct, suppression of the evidence derived from the stop would not be warranted. If the police had engaged some gentler means of stopping Parks and some lesser initial restraint of him, as he seems to argue should have

---

[69]    Supp. Hrg. at 87-88.

[70]    Parks's reliance on the recent decision in *Reed v. State,* 2014 WL 1494098 (Del. Apr. 14, 2014), is unpersuasive. In *Reed* the Court found that there was insufficient evidence that the defendant was going to be arrested and that the incriminating evidence would, in turn, have been discovered during a valid search incident to that arrest. The Court held, therefore, under those factual circumstances, that the inevitable discovery exception did not apply. *Id.* at *2.

occurred, the purse on his handlebars – evidence Parks admits would have given the police probable cause to arrest him then and there[71] – would have been immediately apparent to them. And so Parks's Motion to Suppress "any and all evidence seized as a result of" his investigatory detention on the Greenway Trail must be **DENIED.**

The Motion as it relates to the later seizure of Parks's clothing and shoes is **GRANTED.** The rule in Delaware is clear: the State bears the burden of proof on a motion to suppress evidence seized during a *warrantless* search or seizure.[72] For the reasons set forth more fully on the conference record of this matter on May 31, 2014, the State failed to carry that burden here.

**IT IS SO ORDERED.**

*/s/ Paul R. Wallace*
Paul R. Wallace, Judge

---

[71]     Supp. Hrg. at 87-88.

[72]     *Hunter v. State*, 783 A.2d 558, 560 (Del. 2001).