# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR KENT COUNTY

| | |
|---|---|
| STATE OF DELAWARE | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| MICHAEL LAMBERT, | ) |
| 1410004532 | ) |
| | ) |
| Defendant. | ) |

Submitted: May 29, 2015
Decided: June 22, 2015

## OPINION

## UPON DEFENDANT'S MOTION TO SUPPRESS
## DENIED

Lindsay Taylor, Esquire, Department of Justice, for the State.

Adam D. Windett, Esquire of Hopkins & Windett, LLC, Dover, Delaware, attorneys for the Defendant.

CLARK, J.

## I. INTRODUCTION

Before the Court is Michael Lambert's ("Defendant's") Motion to Suppress all evidence seized during the execution of a search warrant at his residence on October 7, 2014. The Defendant alleges the police search of the residence was premature.

Specifically, the Defendant contends that the police searched his residence before a warrant was issued by a Justice of the Peace based upon certain time stamps on the documents. Accordingly, the Defendant argues that evidence discovered pursuant to that search should be excluded because it was obtained in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section 6 of the Constitution of the State of Delaware. A suppression hearing was held on May 20, 2015 regarding these issues. In Defendant's supplemental submission after the hearing, the Defendant also contended that the application for the warrant did not meet the requirements of 11 *Del. C.* § 2306, thereby making the warrant statutorily insufficient. For the following reasons, the Defendant's motion is **DENIED**.

## II. FINDINGS OF FACT

On October 6, 2014, Detective Golace of the Anne Arundel County Police Department (MD) contacted Sergeant Lance Skinner ("Sergeant Skinner") of the Delaware State Police in reference to a drug related shooting and robbery in Maryland. Detective Golace advised Sergeant Skinner that during the previous day, a drug dealer was robbed at gun point in that jurisdiction by an unknown black male and white female. During the course of the robbery, the victim was shot. Detective Golace informed Sergeant Skinner that the male suspect, while fleeing the scene of the robbery, robbed a woman at gun point stealing her blue 2004 Volvo four door S80

with Maryland registration. The shooting victim did not know the gunman's name but believed he lived in Delaware and provided the police with the gunman's description and contact number, all of which were relayed by Detective Golace to Sergeant Skinner.

Sergeant Skinner forwarded the telephone number to members of the Delaware State Police who ran a DELJIS inquiry linking the number to a woman by the name of Angelica Harris with a listed address of 1022 School Street, Houston, Delaware. The investigation also revealed that the address was listed as a residence by the Defendant.[1] At that point, the Delaware State Police sent a photograph of the Defendant to the officers in Maryland who confirmed the picture appeared to match the description provided by both victims.[2]

The following day, on October 7, 2014 at approximately 7:30 a.m., Sergeant Skinner drove past the address in question and observed a blue Volvo with Maryland registration that matched the one reported stolen. While the vehicle's plate was partially obscured from the roadway, officer Skinner could observe the first three characters of the registration, which matched the first three characters from the stolen

[1] Sergeant Skinner testified that the Defendant's criminal history was forwarded to him and that he was also familiar with the Defendant– and what he described as a propensity for violence– from his time as an undercover drug officer in Sussex County.

[2] At that point a photograph lineup had not been performed because one of the victims was still being hospitalized for the gunshot wound.

vehicle. At that point, Sergeant Skinner alerted relevant members of the Delaware State Police, including Detective Sean O'Leary ("Detective O'Leary") who mobilized a Special Operations Response Team ("SORT").[3] Sergeant Skinner also contacted Detective Jason Vernon ("Detective Vernon") at Delaware State Police Troop 3 and instructed him to submit a search warrant application and affidavit based on the aforementioned information. In the meantime, Sergeant Skinner continued to monitor the property as other surveillance units arrived and members of the SORT team staged at the nearby Milford Police Department.

According to Detective Vernon, a search warrant application and an affidavit were completed and faxed to the Justice of the Peace Court No. 2 sometime between 10 a.m. and 10:10 a.m. At the suppression hearing, Detective Vernon explained his warrant application practice, as a matter of course, and testified that he followed this process in the instant case. He testified that his practice, in relevant order, included (1) typing the affidavit and application, and the probable cause affidavit, and then (2) faxing it to Justice of the Peace Court No. 2. Thereafter, by video phone he (3) swears to the warrant, and then the Judge (4) approves the warrant and returns it to Detective Vernon by fax, who (5) then signs the application , and then refaxes it to

_____

[3] One of SORT's duties is to execute high risk search warrants, which, officers testified appeared necessary given the circumstances of the investigation and the criminal history of the suspected Defendant.

the Judge.

Shortly after Detective Vernon's original fax and before he appeared by video before the Judge, a male occupant exited the residence. Surveillance teams then observed the man reenter the building before exiting a second time with a black bag. The Police then took the individual into custody. The apprehended individual informed the officers that the Defendant was inside the residence. By that time, an armored SORT van had pulled into the driveway. A loudspeaker was used to order the remaining occupants out of the residence. A short time later, the Defendant and an adult and minor female exited through the front door and were detained by the police.[4]

At that point, the initial search warrant had yet to issue. Detective Vernon then drafted a second warrant application and affidavit seeking to search the residence for additional items based upon the new information supplied by the occupant with the black bag. According to his testimony, the second warrant

---

[4] Members of SORT team, prior to the issuance of the warrant, then performed a precautionary sweep of the residence to secure the scene and ensure no other occupants remained in the residence. Detective O'Leary testified that the residence was not searched at that time. The SORT team found no other occupants inside the residence and exited. Once outside, an officer positioned himself at the threshold of the front entrance to ensure no one entered the residence. Detectives O'Leary and Daddio testified that an unknown, but noticeable amount of time passed while they stood at the front entrance waiting for the approval of the search warrant. The Defendant's motion to suppress did not challenge this initial precautionary sweep of the residence and the warrants in question do not rely on any information or evidence obtained during it. Therefore, the Court need not address this matter.

application and affidavit were faxed to the Justice of the Peace Court shortly after 10:20 a.m. At that point, the officers remained in place, awaiting permission to search the residence pending the results of the search warrant applications. The Judge at Justice of Peace Court No. 2 next reviewed both warrant applications and Detective Vernon appeared via video conference to swear to them. Thereafter, Detective Vernon testified that the Judge said both warrants were approved and the officers were free to execute the search. Detective Vernon then **immediately** contacted officers at the scene by phone and the search of the residence began. The search occurred at either 10:39 or 10:40a.m. It uncovered a loaded firearm and the keys to the stolen Volvo parked to the rear of the residence. At some point very shortly **after** the search commenced, Detective Vernon then signed the application and faxed the now complete application package back to the Justice of the Peace Court No. 2.

The warrants at issue in this case have a variety of different time stamps.[5] The only consistent time stamp, found at the bottom of each page of both warrants, has fax markings of 10:50a.m. The first warrant has time stamps from a fax machine across

---

[5] As discussed in greater detail below, at the suppression hearing, the Defendant argued that the only logical interpretation of the time stamps proves that the officers testimony involving the chronological events leading up to the search cannot be true (*i.e.*, the officers searched the residence before the warrant issued).

the top of the pages with times of 10:08a.m., 10:09a.m., 10:24a.m. and 10:31a.m. The warrant also has an official Court time stamp on the first two pages of 10:46a.m. The second warrant was clocked in at Justice of the Peace Court No. 2 at 10:45a.m. No testimony was provided indicating at what point in the application/issuance process Justice of the Peace Court No. 2 personnel clocked in the warrants and applications. There was also no testimony authenticating the accuracy of the various fax reference times on the documents..

## III. STANDARD OF REVIEW

On a motion to suppress evidence seized during a warrantless search or seizure, the State generally bears the burden of establishing that the challenged search or seizure comported with the rights guaranteed by the United States Constitution, the Delaware Constitution, and Delaware statutory law.[6] If, however, a search or seizure is done pursuant to a warrant, on a motion to suppress challenging its validity, the burden shifts to the Defendant because "[a] search or seizure pursuant to a duly issued warrant is presumptively valid because a determination of the reasonableness

---

[6] *State v. Chandler*, 2015 WL 1731508, at *3 (Del. Super. Apr. 2, 2015) (citing *Hunter v. State*, 783 A.2d 558, 560 (Del. 2001) (noting "[d]espite some arguable earlier confusion in the Delaware case law over which party bears the burden of proof on a motion to suppress evidence seized during a warrantless search, the rule in Delaware should now be clear. The State bears the burden of proof.").

of the intended action is made prior to its inception by a neutral Magistrate."[7]  The party with whom the  burden  rests must persuade the Court by a preponderance of the evidence.[8]

An individual is protected from unreasonable searches and seizures by the Constitutions of the United States and the State of Delaware.  The Fourth Amendment to the United States Constitution provide that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[9]

Similarly, the Constitution of the State of Delaware provides that:

> The people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or thing, shall issue without describing them as particularly as may be; nor then, unless there be probable cause supported by oath or affirmation.[10]

Additionally, the Delaware General Assembly has codified specific statutory provisions outlining the process for both the application for and issuance of search

---

[7] *State v. Prouse*, 382 A.2d 1359, 1362 (Del. 1978) *aff'd*, 440 U.S. 648, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979).

[8] *State v. Sisson*, 883 A.2d 868, 875 (Del. Super. 2005) *aff'd*, 903 A.2d 288 (Del. 2006).

[9] U.S. Const. Amend IV.

[10] Del. Const. Art. 1, § 6 (1897).

warrants. With regard to search warrant applications, 11 *Del. C.* § 2306 requires that:

> The application or complaint for a search warrant shall be in writing, signed by the complainant and verified by his oath or affirmation. It shall designate the house, place, conveyance or person to be searched and the owner or occupant thereof (if any), and shall describe the things or persons sought as particularly as may be, and shall substantially allege the cause for which the search is made or the offense committed by or in relation to the persons or things searched for, and shall state that the complainant suspects that such persons or things are concealed in the house, place, conveyance or person designated and shall recite the facts upon which such suspicion is founded.[11]

## IV. DISCUSSION

### A. Sufficiency of the Warrants

As far as the Defendant's constitutional claims are concerned, the Court finds no violation. First, the Defendant does not challenge the warrants in terms of probable cause or itemization of the place or persons to be searched. Furthermore, the Court is persuaded by the sworn testimony of the officers that the 10:39a.m. search occurred after the warrants were issued and properly supported by "oath or affirmation."

The various time stamps on the warrant are inconclusive as to the stage in the process that they record. Some are clearly before the execution of the search at issue.

---

[11] 11 *Del. C.* § 2306.

Some are after. Nevertheless, ignoring the precise transmittal times, it is uncontroverted that there was a lapse of time between the initial precautionary sweep of the residence and the later search. Sergeant Skinner, on site, testified that he remained in constant contact with Detective Vernon. Detective Vernon testified that he faxed the warrants and applications to the Court, the Judge reviewed them, and Detective Vernon appeared before the Judge via video conference where Detective Vernon swore to the contents of the warrants. After the Judge signed and approved the warrants, he informed Detective Vernon that the warrants were "good to go." Detective Vernon then immediately called Sergeant Skinner, telling him he was approved to execute the search.

The Court finds the testimony of the two officers persuasive and that it establishes that the warrants were supported by oath or affirmation, and issued **prior** to the search. At that juncture, the warrants were in full Federal and State constitutional compliance. However, that does not end the Court's inquiry. As indicated above, the General Assembly has enacted additional statuary safeguards.

Detective Vernon's stated general practice and action in the case at hand do not comply with section 2306's requirement that the application be "signed by the complainant." Although the statute does not expressly provide where in the process the application must be signed, an application for an action naturally must precede the

10

approval of such action. In this case, after Detective Vernon affirmed the warrants and the Judge signed them, the Justice of the Peace faxed the warrants back to Detective Vernon. According to the testimony of Detective Vernon he then signed the application and faxed it to the Justice of the Peace. Since the testimony of the officers established that the search occurred in the middle of the exchange, the Court finds that the search was executed before the search warrant **application** was completed. Accordingly, the Court must decide whether a constitutionally sufficient warrant technically failing to comply with a statutory search warrant application requirement mandates a suppression of the items seized pursuant to that warrant.

Statutory provisions are neither synonymous with the protections afforded under the U.S. and Delaware Constitutions, nor are they, in their own right, trivial. As the Delaware Supreme Court explained in *Mason v. State*, police officers' actions must be consistent with (1) Federal Constitutional provisions, (2) State Constitutional provisions, and (3) state statutes enacted for the purposes of establishing search warrant requirements. [12] Even if the law enforcement activity in this case comported with the Federal and State Constitutions, it still must satisfy Delaware statutes in order to be reasonable.[13]

---

[12] *Mason*, 534 A.2d 242, 254 (Del. 1987).

[13] *Mason*, Id. at 254-55.

In *Mason v. State,* as in the case at hand, there was no question that the police had probable cause to search the residence. *Mason* involved a nighttime warrant execution with additional statutory requirements fixed by 11 *Del. C.* § 2308. While the statute at issue in this case, 11 *Del. C.* § 2306, sets requirements for application for the warrant, the governing principle remains the same. That is, the statutory provisions governing search warrants adopted by the Delaware General Assembly grant citizens additional protections up and above those provided in the U.S. and Delaware Constitutions. When police conduct does not conform to clear and unambiguous statutory mandates, "evidence seized by virtue of the authority set forth in the illegal search warrant must be suppressed."[14] To find otherwise "would be tantamount to a judicial repeal of a specific Delaware statute" that sets the standards by which applications for warrants are governed.[15]

Here, 11 *Del. C.* § 2306's requirement that the application for the warrant be "signed by the complainant" was unquestionably not met prior to the issuance of the warrant. An application, in natural order, must precede the granting of an application. The police agency's practice clearly does not meet the requirement of the statute. Accordingly, as held in *Mason*, the search in this instance was executed without a

---

[14] *Id.*

[15] *Id.* at 255.

12

valid warrant.[16]

## B.      Good Faith Exception

In *Dorsey v. State*, a divided Delaware Supreme Court held that Delaware Constitutional law does not provide for a good faith exception to the exclusionary rule.[17]  The State argues that the majority opinion was only applicable to the issues specifically before it (*i.e.*, the good faith exception's applicability to the **probable cause requirement of the Delaware Constitution**).

The argument is not entirely without merit.[18]  Indeed, as this Court has

---

[16]  The Superior Court has examined this specific issue before and held differently. In *State v. Fleming,* 1994 WL 233938, at \*3 (Del. Super. May 11, 1994) like the case at bar, the only alleged deficiency was that the search warrant was executed before the application was "signed by the complainant."  The Court did not invalidate the search reasoning that "the purpose of the exclusionary rule would not be furthered by excluding the evidence seized in reliance upon the warrant.  The evidence reveals no police misconduct to deter."  The *Fleming* decision, however, provides no Delaware authority and the majority of the cases cited in support from outside jurisdictions are distinguishable in either fact or law from both *Fleming* and in the instant case.  As initially noted in *Fleming*, "Delaware case law addressing the issue of technically defective warrants is scarce."  That remains true today.  The lack of case law, if anything, suggests to the Court that police are aware of, and routinely abide by, the statutory mandates of Section 2306 - including the requirement that the application be "signed by the complainant." For these reasons, this Court does not follow *Fleming* as it is in contradiction to the holding in *Mason*.

[17]  *Dorsey v. State*, 761 A.2d 807, 819-21 (Del. 2000); See  *United States v. Leon*, 468 U.S. 897, 913 (1984),  (explaining that the federal exclusionary rule was a judicially created remedy aimed at deterring unlawful police conduct, but modifying  the rule to include an exception for good faith reliance by the police on a search warrant which is later held to be invalid for lack of probable cause).

[18]  *Dorsey*, 761 A.2d at 820 (quoting Del. Const. art. I, § 6) (holding that [t]he issue on appeal relates to very specific language in the Delaware Constitution: 'no warrant to search any place ... shall issue ... unless there be probable cause supported by oath or affirmation.' In this

previously noted, "[t]he language of the majority opinion in *Dorsey* can reasonably be read as not extending the scope of the exclusionary rule beyond the constitutional violation then before it."[19]  However, in this case, the State's position, does not adequately account for the Delaware Supreme Court's decision in *Mason v. State*.[20]

As mentioned above, in *Mason*, the Court emphasized that protection from unreasonable search and seizures come from three independent sources.[21]  The Court explained that the *Leon* good faith exception will always be applicable in terms of "the exclusionary rule's application to violations of the Fourth Amendment of the United States Constitution."[22]  However, in the case at hand, as in *Mason*, "the Court is confronted with not only violations of the Fourth Amendment but also with violations of Article I, Section 6 of the Delaware Constitution, and violations of specific Delaware statutes."[23]  The *Mason* Court clearly and unequivocally held that,

---

case, the absence of probable cause is not at issue. Instead, the real dispute between the majority and the minority turns on whether the Delaware Constitution provides a remedy when items are seized pursuant to a search warrant that was issued without probable cause.).

[19] *State v. Upshur*, 2011 WL 1465527, at \*9 (Del. Super. Apr. 13, 2011) (finding that "[t]he *Dorsey* court had no reason to consider whether the exclusionary rule applied to violations of the knock and announce rule, and it is readily apparent from the above language that it did not intend to hold that it does.").

[20] 534 A.2d 242 (Del. 1987).

[21] *Id*. at 254.

[22] *Id*. (citing *Leon*, 468 U.S. at 914).

[23] *Id*.

in such instances, "police officers' actions must be consistent with all three. Even if the law enforcement activity in this case was found to comport with the federal Constitution under [the good faith exception], it would still have to be found to satisfy the Delaware Constitution and statutes in order to be reasonable."[24] Because there the Court declined to extend the good faith exception to statutory violations, the police's failure to comply with the requirements of section 2308 rendered the search unlawful and therefore, exclusion of the evidence was the appropriate remedy.[25]

Although the gravity of protections found in the nighttime search warrant provision of 2308 are arguably greater than those found in the application requirement provision, the broad holding in the *Mason* decision cannot be distinguished to provide a good faith exception to 11 *Del. C.* §2306's signature requirement, to any greater degree than it would apply to a violation of 11 *Del. C.* §2308. Accordingly, although the police conduct in this case clearly fits within the definition of being taken in good faith, *Mason*'s holding provides no basis to ignore the statutory requirement that all warrant applications be "signed by the complainant and verified by his oath or affirmation."[26]

---

[24] *Id*. at 254-55

[25] *Id*.

[26] 11 *Del. C.* § 2306.

15

## C. Inevitable Discovery Doctrine

The Delaware Supreme Court has recognized exceptions to the warrant requirements where "official misconduct should not fatally taint evidence ..."[27] Rather, "taint may be purged and the evidence may be admissible through one of the doctrinal exceptions to the exclusionary rule, such as the independent source doctrine, the inevitable discovery doctrine, the exigent circumstances doctrine, and the attenuation doctrine."[28]

Delaware "has long accepted and consistently applied the inevitable discovery exception to the exclusionary rule."[29] This exception provides that evidence, obtained in the course of illegal police conduct, will not be suppressed if the prosecution can prove that the incriminating evidence would have been discovered through legitimate means in the absence of official misconduct. [30]

In *Cook v. State*, the Delaware Supreme Court explained the doctrine by noting:

[27] *Id*. at 873.

[28] *Lopez-Vazquez v. State*, 956 A.2d 1280, 1292 (Del. 2008) (internal citations omitted).

[29] *State v. Parks*, 95 A.3d 42, 51 (Del. Super. 2014) (citing *Cook v. State*, 374 A.2d 264, 267–68 (Del. 1977); *Martin v. State*, 433 A.2d 1025 (Del. 1981); *Rew v. State*, 1993 WL 61705 (Del. Feb. 25, 1993); *Hardin v. State*, 844 A.2d 982 (Del. 2004); *Thomas v. State*, 8 A.3d 1195 (Del. 2010); *Roy v. State*, 62 A.3d 1183 (Del.2012)).

[30] *Id*. (quoting *Cook*, 374 A.2d at 267–68.

[t]he majority of the cases employing the inevitable discovery exception involve instances in which the illegal police conduct occurred while an investigation was already in progress and resulted in the discovery of evidence that would have eventually been obtained through routine police investigatory procedure. The illegalities in such cases, therefore, had the effect of simply accelerating the discovery. In general, where the prosecution can show that the standard prevailing investigatory procedure of the law enforcement agency involved would have led to the discovery of the questioned evidence, the exception will be applied to prevent its suppression.[31]

In *Cook*, during a precautionary frisk for weapons, police officers found money. The Defendant moved to suppress the evidence on the ground that the search was not supported by reasonable suspicion or probable cause. The Court held that even if the seizure of the money was beyond the scope of a reasonable precautionary search for weapons and therefore unlawful, the money would have been discovered during the course of an inventory search of the Defendant– which is a "standard prevailing investigatory procedure"–subsequent to his arrest.[32] As such, the Court determined, that the seizure of the money was lawful.[33]

More directly applicable to the search at hand is *Martin v. State*, where during the course of a multi-week, multi-state homicide investigation, police uncovered a

---

[31] *Cook*, 374 A.2d at 268 (quoting Comment, The Inevitable Discovery Exception to the Constitutional Exclusionary Rules, 74 Col. L.Rev. 88, 91 (1974)).

[32] *Id.*, 374 A.2d at 267–68.

[33] *Id.*

gun hidden in a toilet during a warrantless search of the Defendant's hotel room. During a suppression hearing, the Court noted the unlawful nature of the hotel search but applied the inevitable discovery doctrine. In applying the doctrine, it noted that "the police undertook a 'saturation investigation,' that is 'one in which the police might be expected as a matter of course to make an unusually thorough investigation utilizing more available avenues or techniques than they ordinarily might.'"[34] Accordingly, absent the unlawful search, the Court was persuaded the gun would have been uncovered eventually; therefore, exclusion was unwarranted. [35]

Like in *Martin* and *Cook*, in the present case, an investigation that would have led to a valid search of the residence was well underway. All the facts supporting the warrant application had already been compiled and submitted to the Justice of the Peace. An unquestionably stolen vehicle was parked immediately to the rear of the residence, and the Defendant does not controvert that his residence was legally secured pursuant to exigent circumstances. At that point, discovery of the evidence at issue was inevitable. There was a saturation investigation of the home at issue under way.

---

[34] *Martin*, 433 A.2d at1032 (quoting LaCount and Girese, The "Inevitable Discovery" Rule: An Evolving Exception to the Constitutional Exclusionary Rule, 40 Alb.L.Rev. 483, 495 (1976)).

[35] *Id*.

This case is markedly different than the cases relied upon by the Defendant where police conducted a search without even attempting to obtain a warrant, only to later (1) acquire an after-the-fact warrant as means to justify the earlier search;[36] or (2) argue that if they had in fact applied for a warrant before conducting the search, they would have been granted one.[37]   Here, there was not one, but two pending search warrants.  While the search warrants were pending, police officers had already secured the residence pursuant to a protective sweep.  The Defendant and all other occupants of the residence were already legally in police custody.  Finally, officers remained outside the entrance of the residence to ensure that it remained  vacant, secure, and untouched until they received word that the warrants issued.

The circumstances surrounding the 10:39 a.m. search involved appropriate law enforcement conduct by the officers on the ground.  The Court is persuaded that had "standard prevailing investigatory procedure" continued, it would have inevitably led to the discovery of the evidence.   At most, the violation hastened the seizure by a handful of minutes.[38]   Accordingly, the Court finds that the inevitable discovery exception is applicable and under the circumstances of this case, suppression is

---

[36] *United States v. Satterfield*, 743 F.2d 827 (11th Cir. 1984).

[37] *United States v. Griffin*, 502 F.2d 959 (6th Cir. 1974).

[38] *Cook,* 374 A.2d  at 264 (holding evidence admissible when a constitutional violation "had the effect of simply accelerating the discovery.").

19

unwarranted.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress is **DENIED.**

 _/s/ Jeffrey J Clark
Judge

20