IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,                )
                                  )
        v.                        )        I.D. No. 2003009148
                                  )
AARON GARNETT,                    )
        Defendant.                )
                                  )

Submitted:  December 13, 2021
Decided:  December 23, 2021

### MEMORANDUM OPINION AND ORDER

*Upon Defendant's Motion to Suppress Evidence*
**DENIED IN PART and DEFERRED IN PART**

Jason C. Cohee, Esquire, and Kristin M. Dewalt, Esquire, Department of Justice, Dover, Delaware, *Attorneys for the State.*

Robert A. Harpster, Esquire, and Cara M. Brophy, Esquire, Office of Defense Services, Dover, Delaware, *Attorneys for Defendant.*

**Primos, J**.

This is the Court's decision regarding the Motion to Suppress Evidence of Defendant Aaron Garnett (hereinafter "Mr. Garnett"). The State seeks to justify a warrantless search of a home located at 32 Willis Road (hereinafter the "home") based on the emergency doctrine, or, in the alternative, the inevitable discovery exception to the warrant requirement. For the reasons discussed below, the emergency doctrine is inapplicable, but the inevitable discovery exception does apply to the search of the home. However, the Court will reserve decision as to whether the inevitable discovery exception applies to Mr. Garnett's confession given that it is unclear to what extent it was derivative and exploitative of the warrantless search that led to discovery of the victim's body and ultimately, through a subsequent search warrant, of other physical evidence in the home. Therefore, for the reasons that follow, Mr. Garnett's Motion to Suppress is **DENIED IN PART** and **DEFERRED IN PART**.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The facts cited herein are those presented during the suppression hearing held on December 3, 2021.

### A. The Wawa Incident

This matter arises from an incident on March 15, 2020. Shortly after 5:40 a.m., the Dover Police Department (hereinafter the "Dover PD") was contacted by an employee of the Wawa store located at 1450 Forrest Avenue in Dover who had allegedly witnessed a domestic violence incident between Mr. Garnett and a child. The bare details given to the officers were that Mr. Garnett had grabbed the throat of a child who appeared to be accompanying him, which would be confirmed through Wawa's video surveillance.[1]

---

[1] *See* St.'s Ex. 1 (surveillance video).

Officers of the Dover PD were dispatched to the Wawa. Upon their arrival, they found Mr. Garnett and three children inside. The three children, as minors, will be referred to by their initials:[2] 1) M.S.—ten years old; 2) F.L.—five years old; and 3) A.G.—five months old. The officers who were dispatched, who were all working the night shift (7 p.m. to 7 a.m.), were as follows: 1) Corporal Anthony Toto (hereinafter "Corporal Toto"); 2) Patrolman First Class Krumm (hereinafter "PFC Krumm"); 3) Sergeant Jennifer Lynch (hereinafter "Sergeant Lynch"); 4) Patrolwoman Alicia Corrado (hereinafter "Patrolwoman Corrado"); 5) Patrolman Dale Starke (hereinafter "Patrolman Starke"); and 6) Patrolman Brandyn Clancy (hereinafter "Patrolman Clancy").

Corporal Toto was the first to arrive on scene. He entered the Wawa and observed Mr. Garnett holding A.G., the infant, with his arms outstretched as opposed to cradling him, which Corporal Toto found odd.[3] Corporal Toto then went outside and made contact with the other officers, listed *supra*, who had arrived.

The officers then reentered the Wawa together, and Corporal Toto was the first to question Mr. Garnett. Mr. Garnett advised Corporal Toto that he had traveled to Dover to take custody of the three children. He told Corporal Toto that his name was Aaron Edwards, and that he could provide neither the name of the children's mother nor the address from which he had come. Subsequently, Corporal Toto attempted to verify the name provided, and no record was found. Mr. Garnett, when confronted with this information, admitted that he had lied regarding his identity. Corporal Toto then placed Mr. Garnett under arrest for criminal impersonation.

Simultaneously with the questioning of Mr. Garnett, Patrolwoman Corrado spoke with the two older children, F.L and M.S., and provided them with

---

[2] *Cf.* Delaware Supreme Court Rule 10.2(9)(b) ("*Names of minor children.* If the involvement of a minor child must be mentioned, only the initials of that child should be used.").
[3] Mt. to Suppress Tr. (Cpl. Toto Testimony) at 12.

refreshments. M.S. told Patrolwoman Corrado that Mr. Garnett had awakened him and the other two children to take a long walk without giving them any justification. Patrolwoman Corrado, along with Sergeant Lynch, then asked F.L. and M.S. for their home address, to which M.S. replied "Willis Road" and F.L. replied "32." Lastly, F.L and M.S. advised Patrolwoman Corrado that their mother was at home sleeping. During her inquiries, Patrolwoman Corrado noticed a scratch on M.S.'s neck and that M.S. was exhibiting nervous behavior.

The officers noticed that neither Mr. Garnett nor the children were carrying anything that indicated that Mr. Garnett was prepared to take care of an infant, *e.g.*, a baby stroller, diapers, or food. The officers also noted that the children seemed underdressed given the weather conditions. According to Corporal Toto and Patrolwoman Corrado, the next investigative steps were to take the children back to the station and try to contact their guardian.

## B. The Attempt to Find the Guardian

Mr. Garnett was transported to Dover PD and, simultaneously with the transfer, the officers sought the guardian for the three minor children at 32 Willis Road. PFC Krumm, Patrolman Starke, and Sergeant Lynch were dispatched to attempt to make contact with the guardian. Upon arrival at the home, the officers knocked for two to three minutes at the front door, giving loud announcements, identifying themselves, and receiving no response. Patrolman Starke then headed to the rear of the home and knocked on the back door. After knocking very briefly—a minute— Patrolman Starke checked the doorknob and noticed that it was unsecured.

Immediately thereafter, Patrolman Starke radioed to the other officers that there was an unsecured door, and, without asking for permission from his supervisor, Sergeant Lynch (who was still at the front of the home), Patrolman Starke turned the

knob and pushed the door inward.[4]  With or without stepping into the home,[5] Patrolman Starke and PFC Krumm shined flashlights into the home and saw what appeared to be a body covered by a blanket, with blood nearby.  As soon as Sergeant Lynch made her way to the rear of the home and confirmed what Patrolman Starke and PFC Krumm had identified, the three officers entered the home and found the dead body of Naquita Hill (hereinafter "Ms. Hill").[6]

When questioned about these circumstances, Patrolman Starke conceded that he opened the door without permission.  This is confirmed by Sergeant Lynch's testimony, in which she stated that she walked around back and found Patrolman Starke and PFC Krumm "standing on the back steps of the residence" with the back door open, allowing her to "look[] in."[7]

In addition, Patrolman Starke appeared to make a delineation between kicking a door open and opening an unsecured door,[8] given the circumstances:  when he was asked on cross-examination, "If that door had been locked would you have kicked it open?" he responded, "Depending on the totality of everything."[9]  He continued by saying that he would not have kicked the door open without asking permission first

---

[4] Mt. to Suppress Tr. (Ptlm. Starke Testimony) at 99–100 ("At that point I open the door. Obviously, like go ajar, push it open and then scanned [sic] inside.").

[5] Based on the testimony, whether or not the officers stepped into the home is unclear.

[6] It was later determined that Ms. Hill was the aunt of M.S. and F.L. (although M.S. and F.L. referred to her as their "mother") and, along with Mr. Garnett, the parent of A.G.

[7] Mt. to Suppress Tr. (Sgt. Lynch Testimony) at 42–43.

[8] This Court agrees with Mr. Garnett that opening an exterior door of a residence constitutes a search under the Fourth Amendment. *See State v. Waters*, 2007 WL 1098120, at \*1 (Del. Super. Apr. 11, 2007) ("Opening the door to the apartment constituted a warrantless search under the Fourth Amendment"); *United States v. Figueroa-Figueroa,* 388 F. Supp. 3d 70, 82 (D.P.R. 2019) ("[O]pening the door to the defendant's house without a warrant and without probable cause of criminal activity to do so, was an invasion of the defendant's privacy."); *cf. Kyllo v. United States*, 533 U.S. 27, 40 (2001) (holding that thermal imaging of a residence, without a warrant, constituted a "search" and violated the defendant's expectation of privacy).  Any inference, therefore, that merely opening the door to a residence cannot constitute a Fourth Amendment violation is erroneous.

[9] Mt. to Suppress Tr. (Ptlm. Starke Testimony) at 107.

from his supervisor, Sergeant Lynch, but that he did not see the need to ask in this situation because the door was unsecured.[10]

Meanwhile, Sergeant Lynch admitted in her testimony that had Patrolman Starke not opened the unsecured back door, she would have left and returned to the home at a later time to try to find the guardian of the children.[11] In her testimony, she agreed with defense counsel that there was a possibility that the guardian was either sleeping or in the bathroom during the period immediately before the officers tried the door.[12]

## C. Contemporaneous/Subsequent Findings of the Dover PD

Once the children were taken back to Dover PD, Patrolwoman Corrado noticed that there were two large items inside M.S.'s pockets.[13] M.S. responded to Patrolwoman Corrado that Mr. Garnett had given him those items for him to "hide."[14] Inside the pockets was Mr. Garnett's cell phone, watch, and credit cards; in addition, M.S.'s pockets contained Ms. Hill's Social Security card and driver's license.[15] Patrolwoman Corrado intended to radio this information to the officers on scene at the home, but they had already entered the home by the time she had ascertained the information.

During the same time period, Mr. Garnett was being processed by Patrolman Clancy before being placed into a cell. Patrolman Clancy saw what "appeared to be

---

[10] *Id.*

[11] Mt. to Suppress Tr. (Sgt. Lynch Testimony) at 62–63:
> **Defense Counsel:** So if Starke wouldn't have opened the back door, you would have just tried back later.
> **Sgt. Lynch:** Yes.

[12] *Id.* at 62.

[13] *Id.* (Ptlw. Corrado Testimony) at 75.

[14] *Id.*

[15] *Id.* at 76.

like a blood stain on one of his socks . . . [that was] a decent size."[16]  Patrolman Clancy asked Mr. Garnett if he was injured, but Mr. Garnett did not respond.

### D. Procedural History

Mr. Garnett submitted a motion on August 16, 2021, to suppress "all evidence obtained during the warrantless search and the fruits thereof as fruit of the poisonous tree."[17]  Specifically, Mr. Garnett moved to suppress:

1. The body and all forensic testing resulting therefrom;
2. All physical evidence sized from the residence located at 32 Willis Road and photographs taken therein;
3. All clothing seized from Mr. Garnett;
4. Mr. Garnett's taped statement.[18]

The State opposed the motion and filed a written response on September 16, 2021. The State contended there were two applicable exceptions to the warrantless entry into the home, as mentioned *supra*.  The Court held a suppression hearing on December 3, 2021.  The State and the defense filed post-hearing submissions, respectively, on December 8, 2021, and December 13, 2021.

## II.    STANDARD

For a motion to suppress evidence seized during a warrantless search, the State bears the burden of showing that the challenged seizure complied with the requirements of the United States Constitution, the Delaware Constitution, and any applicable statutes.[19]   In a suppression hearing, the Court sits as the finder of fact

---

[16] *Id.* (Ptlm. Clancy Testimony) at 90–91.
[17] Def.'s Mot. to Suppress ¶ 18.
[18] *Id.*
[19] *State v. Roundtree*, 2017 WL 4457207, at *2 (Del. Super.  Oct. 4, 2017) (citing *State v. Lambert*, 2015 WL 3897810 at *3 (Del. Super. 2015) (*aff'd* 149 A.3d 227 (Del. 2016))).

and evaluates the credibility of the witnesses.[20] The State's burden is to establish the legality of the search by a preponderance of the evidence.[21] In this matter, the State concedes that Mr. Garnett has standing to contest the warrantless search; therefore, the Court need not make a preliminary finding regarding that issue. [22]

## III. DISCUSSION

The United States Supreme Court has noted that "an invasion of the sanctity of the home" is a "chief evil against which the wording of the Fourth Amendment is directed.[23] Under well-settled Fourth Amendment jurisprudence, government searches must generally be undertaken pursuant to warrants supported by probable cause or under circumstances falling within a specific exception to the warrant requirement.[24] The Delaware Supreme Court has recognized and sanctioned both the emergency doctrine[25] and the inevitable discovery exception[26] as two exceptions to that requirement. The Court will turn first to the emergency doctrine.

---

[20] *State v. Bordley*, 2017 WL 2972174, at *2 (Del. Super. July 11, 2017) (citing *State v. Hopkins*, 2016 WL 6958697, at *2 (Del. Super. Nov. 28, 2016)).

[21] *Id.* (citing *State v. Lambert*, 2015 WL 3897810, at *3 (Del. Super. June 22, 2015)).

[22] Prior to the suppression hearing, the State filed a letter with the Court indicating that it was "withdraw[ing] its challenge to the defendant's claim of standing to contest the search of the residence at issue." D.I. 32.

[23] *Payton v. New York*, 445 U.S. 573, 573 (1980); *see also Welsh v. Wisconsin*, 466 U.S. 740, 740 (1984) ("[B]efore government agents may invade the sanctity of the home, the government must demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries.").

[24] *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 652–53 (1995); *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

[25] *See Guererri v. State*, 922 A.2d 403, 406 (Del. 2007) (adopting the test for the emergency doctrine).

[26] *See Cook v. State*, 374 A.2d 264, 268 (Del. 1977) (approving of the inevitable discovery exception).

## A. Emergency Doctrine

The emergency doctrine allows for an otherwise illegal entry if there is an immediate need for the assistance of police to protect life or property.[27] In *Guererri v. State*, the Delaware Supreme Court articulated the three-pronged test to determine the legality of a search under the emergency doctrine.[28] Under *Guererri*, for a warrantless search to be justified under the emergency doctrine exception, the state must show by a preponderance of the evidence that (1) the police had reasonable grounds to believe that there was an emergency at hand and an immediate need for their assistance for the protection of life or property, (2) the primary motive for the search was not to arrest and seize evidence, and (3) there was a reasonable basis, approximating probable cause, to associate the emergency with the location to be searched.[29]

### i. First Prong—There was no "emergency at hand" or immediate need for assistance to protect life or property.

At the outset, it appears that there may have been facts to support the inference that the guardian was in danger, given Mr. Garnett's changing storyline and refusal to identify the name of the mother of the children, the lack of baby supplies to support his claim that he was taking custody of the children, the fact that Mr. Garnett awoke the children suddenly to walk a long distance (*i.e.*, several miles), and the domestic disturbance at the Wawa during which Mr. Garnett violently grabbed M.S.'s neck.

However, the testimony of the officers who conducted the warrantless search was devoid of any indication that the Wawa incident referenced *supra* created a sense that the guardian of the children was in danger. Had the officers waited and

---

[27] *Guererri*, 922 A.2d at 406.
[28] *Id.*
[29] *Id.*

9

returned to the home at a later time, as Sergeant Lynch had suggested would have occurred but for Patrolman Starke's action,[30] they would have been armed with additional pertinent information. That information, likely, could have turned the situation into a welfare check, as will be discussed *infra*, in addition to the original primary purpose of locating the guardian. [31]

Nevertheless, at the time Patrolman Starke breached the "sanctity" of the home, it was not a welfare check, as the State contended. It was an action by Dover PD to locate the guardian of the three children, not for the guardian's welfare but for

---

[30] The testimony from Sgt. Lynch that she would have just returned at a later time exemplifies the lack of concern the officers *on scene* had for the "life" of the guardian and the absence of any appreciation of an "emergency at hand."

[31] Mr. Garnett argues that the State, by contending that the officers were conducting a welfare check at the home, is impermissibly applying the community caretaker exception to the warrantless entry of the home. Def.'s Post-Hr'g Submission (Dec. 13, 2021) at 1 (D.I. 35). The Court agrees with Mr. Garnett that the community caretaker doctrine does not extend to a warrantless search of a home. *See State v. Hamilton*, 2017 WL 4570818, at *9 (Del. Super. Oct. 12, 2017) ("The [community caretaker] doctrine has never been applied to a warrantless search of a home. Rather, it has been exclusively applied to the seizure of an individual outside the home."); *see also Caniglia v. Strom*, 141 S. Ct. 1596, 1600 (2021) (refusing to expand the scope of the community caretaker doctrine to searches of a residence).

However, it would appear to the Court that during oral argument the State was contending that the welfare check evolved into an emergency that created exigent circumstances, *i.e.,* an exception to the warrant requirement under the emergency doctrine. As mentioned *supra*, the Court finds that the officers were not dispatched to the home to conduct a welfare check. However, as will be discussed *infra*, it was inevitable that the officers would have returned to the home at a later time but for the warrantless entry by Patrolman Starke; at that time any "welfare check" of Ms. Hill would have evolved into a situation justifying entry into the home pursuant to the emergency doctrine given the fact that Ms. Hill would have continued to be unresponsive and given additional information learned by investigating officers. *See, e.g., State v. Junk*, 2008 WL 852783, at *4 (Ohio Ct. App. Mar. 31, 2008) ("The officers entered the residence out of concern for appellant's safety rather than for the purpose of investigating criminal activity. As such, the welfare check evolved into an emergency exception to the Fourth Amendment, and the officers were justified in entering the residence.").

the children's welfare.[32] Moreover, there was no indication from the officers' testimony that the need to locate the children's guardian constituted an "emergency" or that the children's lives were in immediate danger—while there was certainly a need to locate a custodial guardian eventually, there is no evidence that the children were not safely in the custody of law enforcement for the time being. Consequently, the State is relying only on two expressed concerns by Patrolman Starke that they contend rise to a reasonable ground to believe that there was an "emergency at hand" regarding "life or property": the first, that no one had answered the door for several minutes; and the second, that there was an unsecured door at the rear of the home.

The Court does not find that either of these, individually or jointly, are enough to amount to an "emergency at hand" given the early hour, the fact that the officers were aware that the guardian was allegedly sleeping, and the short duration of time that passed between the officers' arrival at the home and the entry—approximately five minutes total. Therefore, the emergency doctrine does not apply because the State has failed to satisfy the first prong, and the Court need not consider the remaining two prongs.

## B. Inevitable Discovery Exception

The Court now moves to the State's second proffered exception to the warrant requirement, *i.e.*, inevitable discovery. The inevitable discovery exception to the exclusionary rule provides that evidence obtained in the course of illegal police conduct "will not be suppressed if the prosecution can prove that the incriminating evidence would have been discovered through legitimate means in the absence of official misconduct."[33] The inevitable discovery exception typically

---

[32] The State conceded in its post-hearing submission that the "investigators' primary purpose in entering the residence was to find a guardian for the children." State's Post-Hr'g Submission (Dec. 8, 2021) at 1 (D.I. 34).

[33] *Cook*, 374 A.2d at 267-268.

involve[s] instances in which the illegal police conduct occurred while an investigation was already in progress and resulted in the discovery of evidence that would have eventually been obtained through routine police investigatory procedure. The illegalities in such cases, therefore, had the effect of simply accelerating the discovery.[34]

The seminal decision of the United States Supreme Court adopting the inevitable discovery exception is *Nix v. Williams*.[35] In *Nix*, the officers had relied on statements that violated the defendant's right to counsel to locate the body of a ten-year old missing child.[36] The Court held that the inevitable discovery exception applied because volunteer search teams were closing in on the body's location at the time of the officer's discovery and the searchers would have discovered the body in a short period of time absent the constitutional violation.[37]

Here, the State has shown by a preponderance of the evidence that at some point in the near future from when the officers warrantlessly entered the home, the officers would have re-attempted contact with the guardian and discovered the body pursuant to routine police procedures. It is not speculation, as Mr. Garnett argues, that the body would have been found, as there were at least two avenues to finding the body that became increasingly apparent either contemporaneously with the entry into the home or shortly thereafter: (1) a future check of the home that would have quickly been necessitated because the children required a guardian to care for them, together with an increasing concern for Ms. Hill's own welfare resulting from information that law enforcement was gathering that would have eventually justified a search under the emergency doctrine; and (2) the increasing likelihood that a

---

[34] *Id.* at 268 (quoting Comment, *The Inevitable Discovery Exception to the Constitutional Exclusionary Rules*, 74 Col. L. Rev. 88, 90 (1974)).

[35] 467 U.S. 431 (1984).

[36] *Id.* at 435–36.

[37] *Id.* at 449–50 ("On this record it is clear that the search parties were approaching the actual location of the body, and we are satisfied, along with three courts earlier, that the volunteer search teams would have resumed the search had Williams not earlier led the police to the body and the body inevitably would have been found.").

search warrant would have been applied for and approved, based upon information uncovered by law enforcement separate from the physical evidence discovered as a result of the warrantless entry, that would have allowed access into the home.

### i. The emergency doctrine would have applied to the subsequent law enforcement response to the home to locate the children's guardian.

The need to find the guardian of the children would have been increasingly paramount to the investigation and to the children's welfare. In addition, the officers would have promptly confirmed that 32 Willis Road was the residence of the children and that Ms. Hill was acting as their "mother."[38]  Like the search party in *Nix*, which was on a mission to find the missing ten-year-old child, it is clear here that the Dover PD was on a mission to find the children's guardian that inevitably would have led to Ms. Hill's body.

A five-month-old infant and two school-aged children require the person they consider their "mother" both for nourishment and to fulfill their own state-obligated responsibilities (such as attending school).  It is not speculation to conclude that in a short time the officers would have been able to obtain consent from an outside source to enter the home or, armed with additional information, to enter the home pursuant to the emergency doctrine.  With regard to the latter, law enforcement would soon have become aware of important information gathered by individual law enforcement officers, including (1) the blood stain discovered by Patrolman Clancy on one of Mr. Garnett's socks, and (2) Ms. Hill's Social Security card and driver's

---

[38] Detective Mullaney gave testimony regarding investigative procedures for finding out information about where the children lived and who their guardian was.  He stated:

> I rely on our school resource officers. . . . They have programs that you can call them and give a child's name, which will then provide you with their guardian information, address information, various other contacts.  So I would rely, in this situation, if we were unable to locate a parent or guardian, I would make that call.

Mt. to Suppress Tr. (Det. Mullaney Testimony) at 133.

13

license discovered by Patrolwoman Corrado in M.S.'s pockets and M.S.'s statement to Patrolwoman Corrado that Mr. Garnett had instructed M.S. to "hide" the items in his pockets. These facts, along with Sergeant Lynch's statement that but for Patrolman Starke's opening the rear door of the home, she (Sergeant Lynch) would have gone back and attempted to make contact again, establish that, had law enforcement returned to 32 Willis Road and continued to receive no response, they would have had reasonable grounds to believe that there was a life-threatening emergency at hand requiring their immediate assistance. The other two prongs of the emergency doctrine would have been satisfied as well: the primary motive of entry into the home would have been to assist Ms. Hill, and there would have been a reasonable basis to associate the emergency with the location to be searched. As a result, law enforcement would have discovered Ms. Hill's body, which would have led to the discovery of the other physical evidence in the home through a search warrant obtained in due course.

ii. **Dover PD would have sought and obtained a search warrant for the home that would inevitably have led to the discovery of Ms. Hill's body and the other physical evidence.**

In looking at the totality of the evidence in this case that existed before the home was entered or would have existed shortly thereafter, the State has shown by a preponderance of the evidence that law enforcement would have been able to obtain a search warrant in this matter even *without* a subsequent entry into the home pursuant to the emergency doctrine that would have resulted in the discovery of Ms. Hill's body.

Before the entry into the home, the Dover PD had confirmation, via surveillance footage and a scratch on the neck of M.S., that Mr. Garnett had put his hands, violently, on a minor. Thereafter, Mr. Garnett lied to responding officers about his name. Further, he was unwilling to divulge the information surrounding

14

the children's guardian other than that she was incarcerated, which could not be confirmed at the time. M.S. and F.L. told the officers that that they had left from their mother's home and had walked a great distance to the Wawa with no explanation from Mr. Garnett of why they were doing so, and it was apparent that the children were not adequately clothed. In addition, they stated that their mother was at home sleeping.

Moreover, as noted *supra*, contemporaneously with the officers' entry into the home, the Dover PD had evidence that the victim's Social Security card and driver's license was given to the eldest child to "hide", and that Mr. Garnett had blood— discovered when he was being processed at Dover PD—on his sock that did not appear to be from a wound of his own. Finally, the officers would have discovered, with little effort and time, that 32 Willis Road was the address listed as the home address on the children's school records.

The State has shown, by a preponderance of the evidence, that, in the alternative to warrantless entry under the emergency doctrine, the additional information obtained simultaneously or shortly thereafter the entry would have inevitably led to, and supported, a search warrant of 32 Willis Road pursuant to which Ms. Hill's body, and other physical evidence in the home, would have been lawfully discovered.

### iii. Given the state of the record, it is unclear whether Mr. Garnett's taped statement should be suppressed.

The determination that the inevitable discovery exception applies to the physical evidence obtained from the home, including the victim's body, does not end the inquiry with respect to the statement that law enforcement obtained from Mr. Garnett.[39] There was little focus upon that statement at the hearing. Specifically,

---

[39] Generally, statements must be an "act of free will unaffected by the initial illegality." *Brown v. Illinois*, 422 U.S. 590, 603 (1975). *See also United States v. Vasquez De Reyes,* 149 F.3d 192, 196

it is unclear whether law enforcement confronted Mr. Garnett during his statement with the physical evidence obtained from the home and whether, and to what extent, that may have led to his ultimate confession. The timing of the statement itself is also unclear. In short, it is conceivable that had the physical evidence been discovered legally, and at a later time, Mr. Garnett's statement to police might have differed, and he might not have confessed to the crime. Accordingly, an evidentiary hearing will be held to address these issues, outside the presence of the jury, pursuant to Delaware Rule of Evidence 104(a) and 104(c)(1).

## IV. CONCLUSION

The State has failed to demonstrate by a preponderance of the evidence that the emergency doctrine exception to the Fourth Amendment justified the officers' search. However, the State has justified the warrantless search pursuant to the inevitable discovery exception. Accordingly, Ms. Hill's body and all forensic testing resulting therefrom, all physical evidence seized from the home located at 32 Willis Road and photographs taken therein, and all clothing seized from Mr. Garnett will not be suppressed. [40] The Court will hold a Rule 104(a) hearing outside the presence

---

(3d Cir. 1998) ("[A] statement not yet made is, by its very nature, evanescent and ephemeral. Should the conditions under which it was made change, even but a little, there could be no assurance the statement would be the same."). Therefore, in this case, the State must meet its burden under *Wong Sun v. United States* and show that Mr. Garnett's confession is "sufficiently an act of free will to purge the primary taint of the unlawful invasion." 371 U.S. 471, 487 (1963).

[40] Mr. Garnett argues that the evidence should be suppressed because Delaware's Constitution "affords its citizens greater protections against unlawful search and seizure." Def.'s Post-Hr'g submission at 2 (D.I. 35). For this proposition Mr. Garnett cites to the Delaware Supreme Court's decision in *Jones v. State*, 745 A.2d 856 (Del. 1999). In *Jones*, the Delaware Supreme Court rejected the "carved out controversial exception" regarding "seizure" adopted by the United States Supreme Court in *California v. Hodari D.*, 499 U.S. 621 (1991). *Jones*, 745 A.2d at 868.

This case neither deals with nor requires an analysis of the "seizure" of Mr. Garnett. Mr. Garnett had been lawfully taken into custody for criminal impersonation; therefore, the "greater protection[]" referenced in *Jones* is inapplicable here. There is no case law cited by the defense to support a proposition that the Delaware Constitution expands the rights of its citizens in a way

of the jury regarding Mr. Garnett's taped statement to determine whether that evidence will be suppressed. Thus, for the foregoing reasons, Mr. Garnett's Motion to Suppress is **DENIED IN PART** and **DEFERRED IN PART**.

    **IT IS SO ORDERED.**

_____
Judge

NEP/wjs
oc: Prothonotary
cc: Counsel of Record

---

that would forbid the application of the inevitable discovery exception in circumstances akin to this matter.